**UNITED STATES DISTRICT COURT**
**EASTERN DISTRICT OF LOUISIANA**

| | |
|---|---|
| **O.E., BY AND THROUGH HIS PARENTS, C.E AND C.E.** | **CIVIL ACTION** |
| **VERSUS** | **NO. 25-1054** |
| **ADVOCATES FOR ARTS-BASED EDUCATION, D/B/A THE WILLOW SCHOOL** | **SECTION: "P" (5)** |

<u>**ORDER AND REASONS**</u>

Before the Court is a motion to dismiss (R. Doc. 30) filed by Defendant, Advocates for Arts-Based Education, and a motion for a preliminary injunction (R. Doc. 16) filed by Plaintiff, O.E.[1] This action arises out of allegations that a public charter school is using an admissions assessment to discriminate against students with intellectual disabilities. For the following reasons, Defendant's motion to dismiss is **GRANTED**, and Plaintiff's motion for preliminary injunction is **DENIED**.

I.   **BACKGROUND**

   A.  **Relevant Procedural History**

In early February 2025, about four months prior to the commencement of this action in federal court, Plaintiff, O.E., filed a Request for a Due Process Hearing with the Louisiana Division of Administrative Law, challenging The Willow School's ("Willow") "blanket refusal to accept students with intellectual disabilities."[2] The Request sought a due process hearing to establish violations of the Individuals with Disabilities Education Act ("IDEA"), Americans with Disabilities Act ("ADA"), and Louisiana Human Rights Act ("LHRA") for Willow's use of an

---

[1] O.E. is a minor and brings this action by and through his parents, C.E. and C.E., so the docket lists three plaintiffs. For ease of reference, however, the Court simply refers to the plaintiff party in the singular as O.E.
[2] R. Doc. 1 ¶ 120.

academic achievement assessment as an admissions criterion and "because its lower-school campus is not wheelchair accessible."[3] Among other relief, the Request sought an order "barring" Willow from using the assessment as an admissions criterion.[4] Willow moved to dismiss the request,[5] and the Administrative Law Judge ("ALJ") granted the motion, concluding that the issues were "outside the jurisdiction of th[e] tribunal" because, under the Louisiana Administrative Code, a Request for Due Process Hearing may only be sought on certain matters relating to the identification, evaluation, or educational placement of a student with a disability, or to the provision of a free appropriate public education ("FAPE") to the student with a disability.[6] And the ALJ found that O.E.'s "allegations of systemic discriminatory admissions practices, as well as issues under the ADA and the LHRA" were "unrelated to the identification, evaluation, or educational placement, or the provision of FAPE to [O.E.]."[7] The ALJ's order notified O.E. that he had 90 days to seek review in a civil action, to which this action followed.[8]

O.E. brought this action in federal court in May 2025, but it did not pick up speed until some months later when O.E. filed a motion for partial summary judgment.[9] This Court denied the motion, without prejudice.[10] Although procedurally proper under Federal Rule of Civil Procedure 56(b), it violated this Section's standard scheduling order, which requires leave of court for the filing of motions of this type before the close of discovery.[11] About one week later, O.E. filed a motion for preliminary injunction.[12] Willow filed an opposition in response[13] and two days later

---

[3] R. Doc. 30-3 at 14.
[4] *Id.* at 14–15.
[5] R. Doc. 1 ¶ 121; *see also* R. Doc. 30-4 at 1.
[6] R. Doc. 30-4 at 2–3; *see also* R. Doc. 1 ¶ 121.
[7] R. Doc. 30-4 at 3; *see also* R. Doc. 1 ¶ 121.
[8] R. Doc. 30-4 at 6; *see also* R. Doc. 1 ¶ 122.
[9] R. Doc. 11.
[10] R. Doc. 15.
[11] *Id.*
[12] R. Doc. 16.
[13] R. Doc. 27.

filed a motion to dismiss the case.[14] O.E. then filed a motion to renew the motion for partial summary judgment, which remains pending.[15] In December 2025, this Court heard oral argument on the motion to dismiss[16] and then, some days later, held an evidentiary hearing on the motion for preliminary injunction.[17]

O.E. asserts that Willow, by using an academic achievement assessment as a criterion in its admissions process, (1) violates Title II of the ADA; (2) violates O.E.'s right to a free appropriate public education under the IDEA; (3) violates the LHRA; and (4) commits negligence under state law.[18] O.E. also claims that Willow's lower-school campus is not fully wheelchair accessible.[19] O.E. seeks monetary and injunctive relief, as well as attorney's fees and costs.[20]

### B.  Charter Schools

At the center of this case is a public charter school in a school district comprised almost entirely of charter schools, so some legal background on charter schools is necessary. Charter schools are a relatively recent phenomenon in the education space.[21] They are publicly funded educational institutions that operate pursuant to a contract, or "charter," with a state, school district, or some other public entity.[22] Because they operate through this separate agreement rather than under the standard rules and regulations of a school district, they typically have more autonomy in areas such as curriculum, instruction, and budget, much like traditional private schools.[23]

---

[14] R. Doc. 30.

[15] R. Doc. 32.

[16] R. Doc. 66.

[17] R. Doc. 67.

[18] R. Doc. 1 ¶¶ 143–63.

[19] *Id.* ¶¶ 139–42.

[20] *Id.* at 20.

[21] Robin Cheryl Miller, Annotation, *Validity, Construction, and Application of Statute or Regulation Governing § 2 Charter Schools*, 78 A.L.R.5th 533 (Originally published in 2000) ("Charter schools have become the public educational innovation of the 1990s.").

[22] *Id.*

[23] *See, e.g.*, La. Stat. Ann. § 17:3996(A) ("Notwithstanding any state law, rule, or regulation to the contrary and except as may be otherwise specifically provided for in an approved charter, a charter school established and operated in

Accordingly, charter schools are often tools of innovation and provide families with greater educational choice within the public school system.[24]

Given that charter schools arise from contracts with state entities, states have enacted statutory schemes governing the creation and legal status of charter schools.[25] Congress has not enacted a comprehensive federal statutory scheme governing the creation or legal status of charter schools, so charter schools remain creatures of state law. That said, as public education institutions and (often) federal funding recipients, charter schools are subject to federal laws governing civil rights, special education, and constitutional protections, though the specific implementation of these laws may vary based on the state's charter school statutory framework.

The state statutory scheme relevant here is Louisiana's charter school law.[26] Louisiana Public Charter School Law defines *charter school* as "an independent public school that provides a program of elementary or secondary education, or both, . . . to provide a learning environment that will improve pupil achievement."[27] The statute seeks to advance several goals, including "increas[ing] school choice options throughout the state"; "[e]ncourag[ing] the use of different and innovative teaching methods, educational models, and a variety of governance, management, and

---

accordance with the provisions of this Chapter and its approved charter and the school's officers and employees shall be exempt from all rules and regulations of the state board and those of any local school board that are applicable to public schools and to public school officers and employees except for the following rules and regulations otherwise applicable to public schools . . . ."). *See also Voices for Int'l Bus. & Educ., Inc. v. Nat'l Lab. Rels. Bd.*, 905 F.3d 770, 774 (5th Cir. 2018) ("One of the perceived virtues, if not *the* virtue, of charter schools is that a lack of political oversight gives them freedom to experiment.").

[24] *See, e.g.*, La. Stat. Ann. § 17:3972(A) ("It is the intent of the legislature in enacting this Chapter to authorize school choice options for parents, teachers, and pupils through the creation of innovative kinds of independent public charter schools."); Del. Code Ann. tit. 14, § 501 (West) (referring to "independent 'charter' schools" when stating that "[t]his chapter is intended to . . . encourage the use of different and innovative or proven school environments and teaching and learning methods; provide parents and students with measures of improved school and student performance and greater opportunities in choosing public schools . . . ."); Mass. Gen. Laws Ann. ch. 71, § 89(b) (West) ("The purposes of establishing charter schools are: (i) to stimulate the development of innovative programs within public education . . . (iii) to provide parents and students with greater options in selecting schools within and outside their school districts . . . .").

[25] As of 2002, 37 states had some type of charter school law. *See Zelman v. Simmons-Harris*, 536 U.S. 639, 683 n.9 (2002) (Thomas, J., concurring).

[26] *See* La. Stat. Ann. §§ 17:3971–4002.6.

[27] *Id.* § 17:3973(2)(a).

administrative structures"; and "[i]ncreas[ing] learning opportunities and access to quality education for pupils."[28]

Louisiana's statutory scheme provides for five "types" of charter schools.[29] Although creation of a charter school depends on its "type," generally, charter schools in the State are created pursuant to a performance-based contract, or charter, between a nonprofit corporation and the State Board of Elementary and Secondary Education or the local school board.[30] That contract establishes, among other things, the school's mission and educational model; "[a]dmission requirements, if any, that are consistent with the school's role, scope, and mission"; and accountability measures.[31]

Consistent with the statute's purpose, charter schools in the State enjoy significant operational flexibility, including authority over curriculum and instructional methods, budgeting and finances, and personnel decisions.[32] As to enrollment, charter schools are generally required to be open to all students within the authorized geographic area and use random lotteries if applications exceed the available seats.[33] Limited admissions criteria are permitted, however, in certain circumstances. For example, Louisiana law permits charter schools to establish specific admission requirements "related to a school's mission[,] such as auditions for schools with a performing arts mission or proficiency in a foreign language for schools with a language immersion mission."[34] In addition, any school chartered prior to July 2012 that previously "incorporated achievement of a certain academic record as part of its admissions requirements may

---

[28] *Id.* § 17:3972(B).
[29] *Id.* § 17:3973(2).
[30] *See id.* § 17:3973(2)(b); *see also Voices for Int'l Bus. & Educ., Inc. v. Nat'l Lab. Rels. Bd.*, 905 F.3d 770, 772 (5th Cir. 2018).
[31] *See id.* § 17:3991(B).
[32] *Cf. id.* § 17:3996.
[33] *See id.* § 17:3991(C)(1).
[34] *Id.* § 17:3991(B)(3).

5

continue to use such admission requirements."[35] With Louisiana's charter-school framework in mind, the Court turns to the instant motions.

## II.    MOTION TO DISMISS

Willow seeks to dismiss O.E.'s IDEA, ADA, and LHRA claims, pursuant to Federal Rule of Civil Procedure 12(b)(6), for failure to state a claim upon which relief can be granted.[36] Willow also asserts that the IDEA claim should be dismissed for lack of subject-matter jurisdiction, pursuant to Rule 12(b)(1), because O.E. lacks standing.[37] In the alternative, Willow asserts that the entire case should be dismissed, pursuant to Rule 12(b)(7), for failure to join Orleans Parish School Board ("OPSB"), an entity Willow alleges is an indispensable party under Rule 19.[38]

This Part will address the IDEA and ADA claims in turn. Although the Court heard evidence at the preliminary injunction hearing, the Court considers that evidence only where relevant to the preliminary injunction analysis and not in evaluating the sufficiency of the pleadings under Rule 12(b)(6). Because the Court dismisses O.E.'s ADA and IDEA claims under Rule 12(b)(6) and declines to exercise supplemental jurisdiction over the state law claims, the Court will not address Willow's 12(b)(7) argument.

### A.  Factual Allegations

#### i.  Plaintiff, O.E.

Plaintiff, O.E., is a nine-year-old boy with profound physical and intellectual disabilities.[39] Compared to a typically developing child, his cognitive functioning is that of a one- to two-year-

---

[35] *Id.*
[36] R. Doc. 38.
[37] *Id.*
[38] *Id.*; R. Doc. 38-1 at 34–35.
[39] R. Doc. 1 ¶¶ 11–35.

old child.[40] O.E. is non-verbal, so to communicate, he uses an "eye-gaze"-enabled augmentative and alternative communication device.[41] Because of his physical disabilities, he cannot walk without assistance and uses a wheelchair.[42] When O.E. was four years old, he was evaluated by the Jefferson Parish Public School System, the district in which he was living at the time, and an individualized education program ("IEP") was created for O.E.[43] Now, O.E. and his parents reside in New Orleans, so he is currently a resident of Orleans Parish.[44] At the time of the events giving rise to the instant action, O.E. was homeschooled.[45]

### ii. Orleans Parish School System

Orleans Parish has a unique public school system. The school system is comprised almost entirely of public charter schools with only one "traditional" public school.[46] To attend a public school in Orleans Parish, students apply to schools through a parish-wide application system governed by Orleans Parish School Board ("OPSB").[47]   In a "lottery" fashion, OPSB's system assigns students to schools.[48] In addition to OPSB's application, Willow has its own admissions criteria that a student must meet for him or her to be eligible to attend Willow.[49]

---

[40] *Id.* ¶ 12.
[41] *Id.* ¶¶ 33–34.
[42] *Id.* ¶ 19.
[43] *Id.* ¶ 25.
[44]  *Id.* ¶ 2; *Orleans Parish Profile*, Louisiana.gov, https://www.louisiana.gov/local-louisiana/orleans-parish#:~:text=Orleans%20Parish%20%2D%20The%20official%20website%20of%20Louisiana.
[45] R. Doc. 1 ¶¶ 27–31.
[46] *Id.*  ¶¶ 38–39.
[47] *Id.* ¶ 77.
[48] *Id.*
[49] *Id.* ¶¶ 76–81.

### iii.   Defendant, Advocates for Arts-Based Education (The Willow School)

Advocates for Arts-Based Education is a nonprofit corporation that operates a school known as The Willow School.[50] Willow is a public charter school located in New Orleans.[51] Under Louisiana law, Willow is a "Type 3" charter school.[52] A Type 3 school is "a preexisting public school converted and operated as the result of and pursuant to a charter between a nonprofit corporation and the local school board."[53]

As part of its admissions process, and in addition to other admissions criteria, Willow requires each applicant to take an assessment known as the Iowa Assessment.[54] An applicant must obtain a minimum score on the Iowa Assessment to be eligible for assignment to Willow.[55] That is, if an applicant does not obtain a certain minimum score on the Iowa Assessment, he or she may not continue with Willow's admissions process, and thus may not attend Willow.

Generally, students seeking admission into fourth grade, like O.E., have only three to six hours to complete the assessment.[56] Willow creates a "scorecard," or "matrix," for each applicant, and an applicant's score on the Iowa Assessment makes up the largest share of possible points on an applicant's matrix.[57] Therefore, "the higher [an applicant] score[s], the[] higher their chances of admission."[58]

---

[50] *Id.* ¶ 5.
[51] *Id.* ¶¶ 6–7.
[52] *Id.* ¶ 40.
[53] La. Stat. Ann. § 17:3973(2)(b)(iii).
[54] R. Doc. 1 ¶ 83.
[55] *Id.* ¶ 85.
[56] *Id.* ¶ 84.
[57] *Id.* ¶ 92.
[58] *Id.* ¶ 94.

### iv.  O.E.'s Experience with The Willow School's Admissions Process

Last school year, O.E. applied to Willow for the 2025-2026 school year through OPSB's system. The events giving rise to the instant action began in November 2024 when O.E.'s father contacted admissions officials at Willow to discuss O.E.'s application.[59] Around this time, Willow received O.E.'s IEP and other documents related to O.E.'s testing accommodations.[60] At some point, O.E.'s father also requested that Willow waive the Iowa Assessment for O.E., which Willow refused to do.[61] In response, O.E.'s father threatened Willow with a lawsuit.[62] Nevertheless, O.E. submitted a complete application for Willow through OPSB's system, and O.E. took the Iowa Assessment on Willow's middle school campus over a span of two days in mid-February 2025.[63] O.E. did not obtain the minimum score necessary to be eligible for admission into Willow.[64]

### B.  Individuals with Disabilities Education Act (IDEA) Claim

The Court begins with Willow's attack on O.E.'s claim under the IDEA for denial of a FAPE. Willow first contends, under Rule 12(b)(1), that O.E. lacks standing to sue Willow based on the absence of standing under the IDEA.[65] Willow's second argument challenges O.E.'s right to relief under Rule 12(b)(6) based on the ALJ's finding that "allegations of systemic discriminatory admissions practices . . . are unrelated to the identification, evaluation, or educational placement, or the provision of FAPE."[66]

---

[59] Id. ¶¶ 95–96.
[60] Id. ¶ 104.
[61] Id. ¶¶ 95, 108.
[62] Id. ¶ 103.
[63] Id. ¶¶ 115–16.
[64] Id. ¶ 118.
[65] R. Doc. 30-1 at 12–13.
[66] Id. at 30–34.

### i. The IDEA's Administrative-Exhaustion Requirement

This claim comes before the Court in an unusual procedural posture. Generally, a plaintiff is required to exhaust the state's administrative remedies before filing suit in the district court to seek relief under the IDEA.[67] The district court then reviews the decision of the hearing officer.[68] But there are exceptions to the administrative-exhaustion requirement. For instance, if exhaustion would be futile or if the "gravamen" of the plaintiff's complaint is disability discrimination and not denial of a FAPE, then the plaintiff need not clear the IDEA's administrative hurdles.[69] The plaintiff may also avoid the administrative-exhaustion requirement if the relief sought is not one that the IDEA can provide.[70] On top of that, the United States Court of Appeals for the Fifth Circuit "has not yet determined whether exhaustion under the IDEA is a jurisdictional requirement" or a mandatory claim-processing rule.[71] Nor has it "'directly addressed the point' of whether a plaintiff's failure to exhaust administrative remedies under the IDEA deprives the court of subject matter jurisdiction."[72]

Here, the ALJ decided that she lacked jurisdiction over O.E.'s "allegations of systemic discriminatory admissions practices," which she determined "are unrelated to the . . . provision of FAPE." That language implicates a host of potential issues under the IDEA's administrative requirement, like whether exhaustion was, as the ALJ determined, futile or whether the "gravamen" of O.E.'s complaint, like the ALJ implies, is disability discrimination. But Willow

---

[67] *Lartigue v. Northside Indep. Sch. Dist.*, 100 F.4th 510, 518 (5th Cir. 2024) (citing *Fry v. Napoleon Cmty. Schs.*, 580 U.S. 154 (2017)); *see also* 20 U.S.C. § 1415(l).

[68] 20 U.S.C. § 1415(i)(2)(B).

[69] *Gardner v. Sch. Bd. Caddo Par.*, 958 F.2d 108, 111–12 (5th Cir. 1992); *Lartigue*, 100 F.4th at 515.

[70] *Lartigue*, 100 F.4th at 515 (citing *Luna Perez v. Sturgis Pub. Schs.*, 598 U.S. 142, 149–50 (2023)).

[71] *T. B. by & through Bell v. Nw. Indep. Sch. Dist.*, 980 F.3d 1047, 1050 n.2 (5th Cir. 2020) (noting that "the Supreme Court has recently held that Title VII's administrative exhaustion requirement is not jurisdictional but is, instead, a mandatory claim-processing rule" (citing *Fort Bend Cnty., Texas v. Davis*, 587 U.S. 541 (2019))).

[72] *T. B. by & through Bell*, 980 F.3d at 1050 n.2 (quoting *Doe v. Harlandale Indep. Sch. Dist.*, No. SA-20-CV-00960-JKP, 2020 WL 6566854, at *2 (W.D. Tex. Nov. 9, 2020)).

does not dispute O.E's exhaustion of administrative remedies under the statute.[73] Instead, the essence of Willow's 12(b)(1) and 12(b)(6) arguments is that it never had an obligation to O.E. under the IDEA because O.E. was never enrolled in Willow. Finding merit in Willow's argument, this Court declines to review the ALJ's finding and dismisses his IDEA claim on other grounds.

### ii. Willow's IDEA Challenge is More Appropriately Analyzed Under Rule 12(b)(6)

Willow's basis for dismissal is a question of legal duty under the statute in question—whether Willow has an obligation to provide a FAPE to O.E. under the IDEA. This is a merits determination, not a question of the Court's power. Thus, Willow's 12(b)(6) motion—not its 12(b)(1) motion—is the proper avenue to review the legal viability of O.E.'s IDEA claim.

To survive a Rule 12(b)(6) motion to dismiss, a complaint must contain sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.'"[74] "A claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged."[75] "'[D]etailed factual allegations' are not required."[76] "The ultimate question in a Rule 12(b)(6) motion is whether the complaint states a valid claim when all well-pleaded facts are assumed true and are viewed in the light  most favorable to the plaintiff."[77] The court's task is not to evaluate the plaintiff's likelihood of success but instead to determine whether the claim is both legally cognizable and plausible.[78] Here, determining whether O.E. has both a legally cognizable and plausible claim for relief under the IDEA requires examining the statute itself.

---

[73] R. Doc. 30-1 at 30.
[74] *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009).
[75] *Id.*
[76] *Id.* at 663.
[77] *Lone Star Fund V (U.S.), L.P. v. Barclays Bank PLC*, 594 F.3d 383, 387 (5th Cir. 2010).
[78] *Id.*

### iii.  Analysis Under the IDEA

"The IDEA offers federal funds to States in exchange for a commitment: to furnish a 'free appropriate public education'—more concisely known as a FAPE—to all children with certain physical or intellectual disabilities."[79] "[A] FAPE comprises 'special education and related services'—both 'instruction' tailored to meet a child's 'unique needs' and sufficient 'supportive services' to permit the child to benefit from that instruction."[80] The "primary vehicle" for providing a FAPE is the individualized education program ("IEP").[81]

To ensure each child within a state receiving IDEA funds has access to a FAPE, "Congress established a three-tiered funding, administration, and implementation scheme . . . ."[82] "[T]he state must submit a plan of compliance to the Secretary of Education which provides federal IDEA funds to the state."[83] "The state is then responsible for administering the funds on the state level, including the distribution of federal funds to local education[al] agencies (LEAs) . . . ."[84] To receive funds from the state, an LEA must submit a plan of compliance to the state educational agency ("SEA").[85] "The LEA then provides services directly to children with disabilities using the funds obtained from the SEA."[86] Accordingly, while the LEA is responsible for the direct provision of services under the IDEA, the SEA is responsible for general supervision of the IDEA's implementation in the state.[87] Thus, the state, through its SEA, is the ultimate guarantor of a FAPE for each child with a disability who resides there.[88]

---

[79] *Fry v. Napoleon Cmty. Schs.*, 580 U.S. 154, 158 (2017).
[80] *Id.* (citing 20 U.S.C. §§ 1401(9), (26), (29)).
[81] *Fry*, 580 U.S. at 158 (citing *Honig v. Doe*, 484 U.S. 305, 311 (1988)).
[82] *Gadsby by Gadsby v. Grasmick*, 109 F.3d 940, 942 (4th Cir. 1997) (citing 20 U.S.C. §§ 1412–14)).
[83] *Grasmick*, 109 F.3d at 942; *see also* 20 U.S.C. § 1412(a).
[84] *Grasmick*, 109 F.3d at 942; *see also* 20 U.S.C. § 1412.
[85] 20 U.S.C. § 1413(a).
[86] *Grasmick*, 109 F.3d at 942; *see also* 20 U.S.C. § 1413.
[87] *See* 20 U.S.C. §§ 1412(a)(11), 1413(a)(1).
[88] *See id.* § 1412(a).

The IDEA defines an LEA as a "public board of education or other public authority legally constituted within a State for either administrative control or direction of, or to perform a service function for, public . . . schools in a city, . . . school district, or other political subdivision of a State."[89] Typically, LEAs are school districts within a state, so an individual public school is usually *not* an LEA, but *part of* an LEA. Thus, in the usual situation, the school district—not an individual school—is directly responsible for ensuring access to a FAPE. A public charter school, however, may be part of an LEA *or* its own LEA.[90] If a charter school is its own LEA, it is generally held to the same standards as all other LEAs, *i.e.*, school districts, "unless State law assigns that responsibility to some other entity."[91]

O.E. hangs his IDEA claim on this final point: he asserts that because Willow has established itself as its own LEA, and because Louisiana law does not assign the responsibility for providing a FAPE to some other entity, Willow "bears the sole responsibility for ensuring that its IDEA obligations are met" for students residing in Orleans Parish's district.[92] Thus, according to O.E., LEAs like Willow must educate all handicapped children who live in the district, so O.E. is entitled to a FAPE from Willow.[93] Willow disagrees; according to Willow, it is enrollment—not residence—that triggers an LEA's obligations under the IDEA.[94]

While the IDEA requires a state to provide a FAPE to children with disabilities "residing in the State,"[95] it contains no similarly unambiguous provision dictating that a public charter school that is its own LEA ("charter-school LEA") must provide a FAPE to students "residing" within

---

[89] *Id.* § 1401(19)(A).
[90] 34 C.F.R. § 300.209(a)–(b).
[91] *See id.* § 300.209(c); *Charlene R. v. Solomon Charter Sch.*, 63 F. Supp. 3d 510, 521 (E.D. Pa. 2014) (citing 34 C.F.R. § 300.209(c)).
[92] R. Doc. 38 at 16–17.
[93] *Id.* at 20 (quoting *Timothy W. v Rochester, N.H., Sch. Dist.*, 875 F.2d 954, 966 (1st Cir. 1989)); *see* R. Doc. 1 ¶ 74.
[94] R. Doc. 30-1 at 24–30.
[95] 20 U.S.C. § 1412(a)(1)(A).

the district in which the charter-school LEA is located. When it comes to whom an LEA must serve, the IDEA indicates that an LEA's obligations extend to children "within its jurisdiction," but the statute does not define that jurisdictional boundary.[96] Instead, the IDEA's three-tiered accountability framework, which "is frequently described as a model of cooperative federalism,"[97] and which "leaves to the States the primary responsibility for developing and executing educational programs for handicapped children," leaves to participating states the primary responsibility of determining how special-education responsibilities are allocated among state and local agencies.[98] Accordingly, states have the power to define the scope of an LEA's jurisdiction,[99] and courts therefore look to state law to determine the boundaries of an LEA's jurisdiction, which state law often defines as residence within a geographic boundary.[100] Thus, to determine Willow's

---

[96] *Id.* § 1413(a)(1) ("The local educational agency, in providing for the education of children with disabilities within its jurisdiction, has in effect policies . . . ."); *see also Est. of Lance v. Lewisville Indep. Sch. Dist.*, 743 F.3d 982, 989 (5th Cir. 2014) ("Specifically, IDEA requires each federally funded school district to: '(1) provide each disabled child within its jurisdictional boundaries with a "free appropriate public education" . . . .'" (quoting *Cypress-Fairbanks Indep. Sch. Dist. v. Michael F.*, 118 F.3d 245, 247 (5th Cir. 1997))).

[97] *See Schaffer ex rel. Schaffer v. Weast*, 546 U.S. 49, 52 (2005) (quoting *Little Rock Sch. Dist. v. Mauney*, 183 F.3d 816, 830 (8th Cir. 1999)).

[98] *See Manchester Sch. Dist. v. Crisman*, 306 F.3d 1, 9–10 (1st Cir. 2002) ("[N]o court has stated that the IDEA itself mandates that a state make determinations of school district liability based invariably on . . . residency.") (finding that the IDEA does not dictate which district or agency within a state must assume financial liability for special education services and, instead, leaves the assignment and allocation of financial responsibility for special education costs of local school districts to each individual's state legislature); *Charlene R. v. Solomon Charter Sch.*, 63 F. Supp. 3d 510, 521 (E.D. Pa. 2014) ("In light of the structure of the statute, *Manchester* is read more naturally to mean that the State has broad authority to distribute responsibility among the LEAs within the state in discharging its responsibility to assure proper education. . . . The proposition that a SEA has the power to allocate responsibility among LEAs subject to its supervision is self-evident . . . ."); *Los Angeles Unified Sch. Dist. v. Garcia*, 669 F.3d 956, 960 (9th Cir. 2012), *certified question answered,* 58 Cal. 4th 175, 314 P.3d 767 (2013) ("Each state is responsible for ensuring compliance with the IDEA and must specify which state or local educational agency (SEA or LEA) is responsible for providing special education services to certain students . . . . Thus, questions of which agency is responsible for providing a student with a FAPE are determined under state law.").

[99] *See also* 34 C.F.R. § 300.209(c).

[100] *See, e.g.*, *Cumberland Reg'l High Sch. Dist. Bd. of Educ. v. Freehold Reg'l High Sch. Dist. Bd. of Educ.*, 293 F. App'x 900, 902–03 (3d Cir. 2008) (looking to state law governing the determination of domicile to resolve a dispute between two school districts over which district was responsible for providing a child with divorced parents residing in the different districts with a FAPE under the IDEA); *Herbert v. St. James Par. Sch. Bd.*, No. CV 25-758, 2025 WL 1685256, at *5 (E.D. La. June 16, 2025) (Ashe, J.) ("Thus, whether a local education authority is responsible for providing a FAPE to a given child, which would entitle that child to IDEA protections as to that local education authority, is dependent upon the threshold determination of residency under the applicable state law."); *R.F. v. Delano Union Sch. Dist.*, No. 116CV01796LJOJLT, 2017 WL 633919, at *4 (E.D. Cal. Feb. 15, 2017) (finding that, under state law, the school district responsible for the education of a child is the district in which the child's parent or legal

"jurisdiction," and hence to whom it owes the IDEA obligation of providing a FAPE, the Court turns to Louisiana law.

According to Louisiana's Regulations for Implementation of the Children with Exceptionalities Act, "[e]ach LEA is responsible for making available a [FAPE] to each eligible student with a disability . . . who resides within its jurisdiction . . . ."[101] The Regulations then go on to define *jurisdiction* as "the right and obligation of an LEA to exercise authority over all students residing within its geographic area . . . ."[102] For "city/ parish school systems, the geographic area is the boundary of the school district as defined in [Louisiana law]."[103] But "*[f]or a charter school that is considered an LEA, the geographic area is the boundary of the educational facility.*"[104] Although an LEA's jurisdiction is referred to as "resid[ence] within [a] geographic area," that language cannot be read literally as applied to charter-school LEAs, given that a charter-school LEA's geographic area is limited to the educational facility itself. Jurisdiction, then, must turn on enrollment rather than physical residence when it comes to charter-school LEAs.[105] This conclusion comports with Louisiana's regulations governing charter schools.

According to the charter school regulations, a charter-school LEA "located in Orleans Parish" shall "provide all identification, evaluation, and special education . . . services to students *enrolled* at the school required by the . . . [IDEA] and other applicable federal and state laws and

---

guardian resides, so "[d]etermining which LEA is a responsible for providing a FAPE to a given child, then, is primarily a determination of residence").

[101] La. Admin. Code tit. 28, pt. XLIII, § 230(B).

[102] *Id.* § 230(D).

[103] *Id.* § 230(D)(1).

[104] *Id.* § 230(D)(2) (emphasis added).

[105] *SWAT 24 Shreveport Bossier, Inc. v. Bond*, 2000-1695 (La. 6/29/01), 808 So. 2d 294 ("[W]here a literal interpretation would produce absurd consequences, the letter must give way to the spirit of the law and the statute construed so as to produce a reasonable result."). *See Camacho v. Ford Motor Co.*, 993 F.3d 308, 311 (5th Cir. 2021) (noting that when interpreting a state statute, the federal court uses the same methods of statutory interpretation used by the state's highest court).

regulations for LEAs[.]"[106] Thus, for charter-school LEAs that are located in Orleans Parish, *enrollment*—not residence—triggers IDEA obligations, including the obligation "for making available a [FAPE] to each eligible student with a disability." But for parish school systems, like OPSB, it is residence within the school district's geographic boundaries that triggers FAPE obligations. Accordingly, a logical reading of Louisiana's regulations provides that OPSB is responsible for ensuring a FAPE to eligible students who reside within Orleans Parish but are not yet enrolled in a school or are enrolled in schools that are not their own LEAs. But Willow, or the applicable charter-school LEA, becomes responsible for ensuring a FAPE to eligible students once the students are enrolled in that school.

Such a reading aligns with the purpose of the IDEA, which was enacted in part to "assure a single line of responsibility with regard to the education of handicapped children."[107] If residency was to trigger a charter-school LEA's FAPE obligation in Orleans Parish's charter-dominant district, the statute would be flipped on its head. In a traditional school district, a residence-based obligation works because one LEA, the school district, serves children according to residence within the district, and thus only one LEA—the school district in which the child resides—is responsible for ensuring a child has access to a FAPE. But in a charter-dominant district, like Orleans Parish, a student residing in the district may attend any number of charter-school LEAs within the school-district LEA. Thus, if residence triggered IDEA responsibility in such a district, multiple LEAs could simultaneously owe a FAPE to the same child. This would create overlapping and indeterminate obligations, which would be untenable under the IDEA's framework.

---

[106] La. Admin. Code tit. 28, pt. CXXXIX, § 2303(B)(2)(a)(ii) (emphasis added).
[107] *St. Tammany Par. Sch. Bd. v. State of La.*, 142 F.3d 776, 784 (5th Cir. 1998) (quoting *Gadsby by Gadsby v. Grasmick*, 109 F.3d 940, 952 (4th Cir. 1997)).

For example, consistent with the IDEA's multi-tiered accountability scheme, the SEA steps in to provide services directly to eligible children if the SEA determines that the LEA responsible has not met the IDEA's requirements for providing a FAPE.[108] If multiple entities simultaneously owe the obligation to provide a FAPE to a child, the SEA would have difficulty determining which LEA's failure triggers state intervention. In Orleans Parish, for instance, the charter-school LEAs could point at each other or at OPSB as the entity responsible for providing a FAPE to a particular child to subvert responsibility under the IDEA, which is exactly what the IDEA seeks to prevent.[109]

Rule 12(b)(6) provides for the dismissal of a claim if a plaintiff fails to state a claim upon which relief can be granted. "[T]he only 'relief' the IDEA makes 'available' is relief for the denial of a FAPE."[110] Here, for all the reasons stated above, the Court has concluded Willow did not owe O.E. a FAPE under the IDEA. Accordingly, O.E has failed to state a legally cognizable claim against Willow for violating his right to a FAPE under the IDEA, and this claim must be dismissed.

O.E. heavily relies on *Timothy W. v. Rochester, N.H., Sch. Dist.*,[111] a First Circuit case, and *Forest Grove School District v. T.A.*,[112] a United States Supreme Court decision, in support of his arguments. But his reliance on these cases is misplaced. Significantly, in both cases, it was undisputed that the defendant was the LEA responsible for providing a FAPE. Thus, the issues in those cases presupposed the answer to the question before this Court, which is whether the defendant–LEA has an obligation to the plaintiff–student in the first place. Those cases, then, are

---

[108] *See* 18 U.S.C. § 1413(g).
[109] *See Honig v. Doe*, 484 U.S. 305, 309 (1988) (noting that Congress "sought 'to assure that all handicapped children have available to them . . . a [FAPE] . . . .'" after congressional studies revealed that "one out of every eight of these children were . . . were neglectfully shepherded through the system until they were old enough to drop out").
[110] *Fry v. Napoleon Cmty. Schs.*, 580 U.S. 154, 169 (2017).
[111] 875 F.2d 954 (1st Cir. 1989).
[112] 557 U.S. 230 (2009).

17

inapposite here. Accordingly, O.E.'s arguments fail, and O.E. does not have a claim for relief against Willow under the IDEA.

### C. Title II of the Americans with Disabilities Act (ADA) Claim

The Court now turns to Willow's 12(b)(6) motion to dismiss O.E.'s ADA claim using the same 12(b)(6) standard articulated above. Willow's motion includes a series of factual assertions, as well as attachments like its operating agreement with OPSB. In deciding a Rule 12(b)(6) motion to dismiss, "[t]he court's review is limited to the complaint, any documents attached to the complaint, and any documents attached to the motion to dismiss that are central to the claim and referenced by the complaint."[113] Not only does O.E. object to the Court's consideration of Willow's factual assertions and attachments,[114] O.E.'s claims do not rely on the operating agreement, and Willow uses the agreement to advance a factual defense.[115] Accordingly, this Court proceeds by addressing O.E.'s ADA claim based only the factual allegations in the complaint, which, at this stage, this Court must accept at true, and on the legal arguments in the briefing.

"The ADA is a 'broad mandate' of 'comprehensive character' and 'sweeping purpose' intended 'to eliminate discrimination against disabled individuals, and to integrate them into the economic and social mainstream of American life.'"[116] While the IDEA imposes "an affirmative obligation on states to assure disabled children a free appropriate public education," the ADA broadly prohibits discrimination against disabled persons.[117] The ADA consists of five Titles,

---

[113] *Id.*

[114] *See* R. Doc. 38 at 1.

[115] *Scanlan v. Texas A&M Univ.*, 343 F.3d 533, 537 (5th Cir. 2003) (finding district court erred in considering report that defendant provided in motion to dismiss when, even though plaintiffs relied on attachment in their complaints, the attachment alone was not central to plaintiffs' claims and was much more central to the defendant's defenses).

[116] *Frame v. City of Arlington*, 657 F.3d 215, 223 (5th Cir. 2011) (quoting *PGA Tour, Inc. v. Martin*, 532 U.S. 661, 675 (2001)).

[117] *D.A. ex rel. Latasha A. v. Houston Indep. Sch. Dist.*, 629 F.3d 450, 453 (5th Cir. 2010); *see also Lartigue v. Northside Indep. Sch. Dist.*, 100 F.4th 510, 513 (5th Cir. 2024) (describing the IDEA and ADA as "two distinct, but linked, statutes").

18

covering various areas such as employment (Title I) and public accommodations (Title III).[118] Relevant here is Title II, which covers state and local government services.[119]

Title II of the ADA provides that "no qualified individual with a disability shall, by reason of such disability, be excluded from participation in or be denied the benefits of the services, programs, or activities of a public entity, or be subjected to discrimination by any such entity."[120] Thus, "[t]o make out a claim under Title II," a plaintiff must show "(1) that he is a qualified individual with a disability; (2) that he was excluded from participation in, or denied the benefits of, services, programs, or activities for which the public entity is responsible, or was otherwise being discriminated against; and (3) that such discrimination is because of his disability."[121] Notably, "the language in the ADA generally tracks the language set forth in" § 504 of the Rehabilitation Act,[122] and "the rights and remedies afforded plaintiffs under Title II of the ADA are almost entirely duplicative of those provided under § 504 . . . ."[123] "The only material difference between the two provisions lies in their respective causation requirements."[124] Therefore, "[j]urisprudence interpreting either section is applicable to both."[125]

O.E. alleges Willow violates the ADA in two respects. First, he alleges that Willow excludes students with intellectual disabilities through its use of the Iowa Assessment in its admissions process. Second, he alleges that Willow's lower-school campus is not wheelchair accessible. Assuming without deciding that Willow is a public entity under Title II and that O.E.

---

[118] 42 U.S.C. §§ 12111–17; *Id.* §§ 12181–89.
[119] *Id.* §§ 12131–34.
[120] *Id.* § 12132.
[121] *Luke v. Texas*, 46 F.4th 301, 305 (5th Cir. 2022).
[122] *Delano-Pyle v. Victoria Cnty., Tex.*, 302 F.3d 567, 574 (5th Cir. 2002).
[123] *Bennett-Nelson v. Louisiana Bd. of Regents*, 431 F.3d 448, 454 (5th Cir. 2005).
[124] *Id.* Whereas § 504 provides that no qualified individual with a disability shall be excluded or denied benefits "solely by reason of his or her disability," Title II does not require that discrimination be the sole reason for the exclusion or denial of benefits. *Id.*
[125] *Hainze v. Richards*, 207 F.3d 795, 799 (5th Cir. 2000).

19

is an individual with a disability, O.E.'s ADA claim fails because he cannot establish that he was excluded "by reason of his disability," or alternatively, that he is "qualified" to attend Willow.

### i. The Iowa Assessment

To satisfy the second and third elements of the prima facie test, a qualified individual with a disability must be excluded from or denied the benefit of a public program or discriminated against "by reason of his disability" in one of several ways.[126] The public entity may do so based on, at least in part, the individual's disability, triggering what has been referred to as conscious discrimination or disparate treatment.[127] Alternatively, the public entity may have a facially neutral policy or practice that prevents individuals with disabilities from "meaningfully accessing" the service or benefit.[128] In this latter situation, "reasonable modifications" may have to be made to ensure meaningful access.[129] If the public entity knowingly fails to accommodate an individual's request or need for a reasonable modification that would give him meaningful access, the failure-to-accommodate theory is triggered.[130] But if the denial of meaningful access is based on a "more 'systemic' obstacle to access," some courts recognize the denial as a disparate-impact claim.[131]

But Title II is not limitless. "[A] public entity is not 'required to undertake measures that would impose an undue financial or administrative burden . . . or effect a fundamental alteration

---

[126] *See Carter as next of friend of Carter v. City of Shreveport*, 144 F.4th 809, 813 (5th Cir. 2025).

[127] *Id.*; *Pickett v. Texas Tech Univ. Health Scis. Ctr.*, 37 F.4th 1013, 1033–34 (5th Cir. 2022).

[128] *Luke v. Texas*, 46 F.4th 301, 305–06 (5th Cir. 2022) ("Lack of meaningful access is *itself* the harm under Title II, regardless of whether any additional injury follows.").

[129] *Alexander v. Choate*, 469 U.S. 287, 301–02 (1985); *see also Smith v. Harris Cnty., Texas*, 956 F.3d 311, 317 (5th Cir. 2020) ("In addition to prohibiting discrimination, the ADA . . . 'impose[s] upon public entities an affirmative obligation to make reasonable accommodations for disabled individuals.'" (quoting *Bennett-Nelson*, 431 F.3d at 454)).

[130] *Payan v. Los Angeles Cmty. Coll. Dist.*, 11 F.4th 729, 738 (9th Cir. 2021); *Smith*, 956 F.3d at 317–18; *Block v. Texas Bd. of L. Examiners*, 952 F.3d 613, 618 (5th Cir. 2020) ("A public entity's failure to make a reasonable modification may satisfy the second and third prongs of the prima facie case."). "Accommodation" and "modification" are used interchangeably in the case law.

[131] *See Sosa v. Massachusetts Dep't of Correction*, 80 F.4th 15, 31 (1st Cir. 2023); *Payan*, 11 F.4th at 738. *But see Payan*, 11 F.4th at 740–44 (Lee, J., dissenting) (arguing that Title II of the ADA and § 504 of the Rehabilitation Act do not allow plaintiffs to sue based on a disparate impact theory of discrimination, especially since the U.S. Supreme Court's decision in *Alexander v. Sandoval*, 532 U.S. 275 (2001), wherein the Supreme Court rejected a private cause of action for disparate impact under Title VI of the Civil Rights Act of 1964).

in the nature of the service.'"[132] Further, evidence of intentional discrimination is necessary to support a claim for monetary damages.[133] The standard for liability, while imprecise, "requires something more than deliberate indifference."[134]

O.E.'s complaint tells a story within a story.  The embedded narrative is O.E's individual experience with Willow's admissions process, namely, his attempt at overcoming the "barrier" that the Iowa Assessment poses to his eligibility.[135] Because of O.E.'s cognitive functioning, he allegedly will never be able to obtain the minimum score necessary for admission into Willow and, thus, waiver of the Iowa Assessment is the only accommodation that will provide him meaningful access.[136] The broader narrative is that this "barrier" was designed to exclude children with intellectual disabilities. According to O.E., Willow uses the Iowa Assessment as a sort of IQ test to "screen out" intellectually disabled students, which enables Willow to receive a "windfall" in "per-pupil" funding from the State of Louisiana, and O.E. is just one victim of this practice. In any event, he alleges that Willow virtually has no students with intellectual disabilities and attributes the disproportionate impact on such students to Willow's use of the Iowa Assessment. Thus, the complaint speaks to the three theories of liability described above; though, Willow's motion addresses only the conscious-discrimination and failure-to-accommodate theories.[137]

---

[132] *Frame v. City of Arlington*, 657 F.3d 215, 232 (5th Cir. 2011) (quoting *Tennessee v. Lane*, 541 U.S. 509, 532 (2004)); *Lane*, 541 U.S. at 532 (Title II "requires only 'reasonable modifications' that would not fundamentally alter the nature of the service provided, and only when the individual seeking modification is otherwise eligible for service.").

[133] *T.O. v. Fort Bend Indep. Sch. Dist.*, 2 F.4th 407, 417 (5th Cir. 2021).

[134] *J.W. v. Paley*, 81 F.4th 440, 451 (5th Cir. 2023).

[135] R. Doc. 1 ¶¶ 74–82, 95–118, 143–48.

[136] *Id.* ¶¶ 80, 111.

[137] R. Doc. 30-1 at 16–22. *But see Shaikh v. Texas A&M Univ. Coll. of Med.*, 739 F. App'x 215, 221 n.6 (5th Cir. 2018) ("On a motion to dismiss, a court 'must examine the complaint to determine if the allegations provide for relief of *any* possible theory." (omitting citations)).

### a. Disparate Impact

O.E.'s complaint primarily relies on the disparate-impact theory. The Fifth Circuit, however, has not squarely recognized or held that disparate impact is a cognizable theory under Title II of the ADA (or § 504 of the Rehabilitation Act). Claims of conscious discrimination, or disparate treatment, and failure to make reasonable accommodations are established in the case law, but disparate-impact claims remain an unsettled area. While several circuits have recognized disparate-impact claims under Title II,[138] and the Fifth Circuit has alluded to such claims,[139] the Fifth Circuit has also declined to recognize disparate-impact private causes of action in a related statutory context, raising substantial questions as to whether such claims are cognizable under Title II in this circuit. Further, to recognize disparate-impact claims would contravene basic principles of statutory interpretation.

The United States Supreme Court left open the question in 1985 in *Alexander v. Choate* when it "assume[d] without deciding that § 504 reaches at least some conduct that has an unjustifiable disparate impact upon the handicapped."[140] Then, in 2001 in *Alexander v. Sandoval*, the Supreme Court held that no private right of action exists to enforce regulations acknowledging disparate-impact discrimination promulgated under Title VI of the Civil Rights Act of 1964.[141]

---

[138] *See Sosa v. Massachusetts Dep't of Correction*, 80 F.4th 15, 31 (1st Cir. 2023); *Hamilton v. Westchester Cnty.*, 3 F.4th 86, 91 (2d Cir. 2021); *A Helping Hand, LLC v. Baltimore Cnty., MD*, 515 F.3d 356, 362 (4th Cir. 2008); *Wisconsin Cmty. Servs., Inc. v. City of Milwaukee*, 465 F.3d 737, 753 (7th Cir. 2006); *Payan v. Los Angeles Cmty. Coll. Dist.*, 11 F.4th 729, 738 (9th Cir. 2021); *J.V. v. Albuquerque Pub. Schs.*, 813 F.3d 1289, 1299 (10th Cir. 2016). *But see Doe v. BlueCross BlueShield of Tennessee, Inc.*, 926 F.3d 235, 241 (6th Cir. 2019) (concluding that § 504 does not prohibit disparate-impact discrimination).

[139] *See T.O.*, 2 F.4th at 417 (stating that while "[e]vidence of intentional discrimination is necessary to support a claim for monetary damages, . . . a plaintiff seeking only equitable relief may succeed on a disparate impact theory" in finding that, absent identifiable theory, complaint contained no allegations to meet "by reason of disability" element).

[140] 469 U.S. 287, 299 (holding that, assuming § 504 or its implementing regulations reach some claims of disparate-impact discrimination, the effect on the handicapped of a state's reduction in annual inpatient hospital coverage under Medicaid is not among those claims). If disparate-impact claims are recognized under § 504's more stringent causation standard, then it follows that such claims are recognized under Title II, whose only difference from § 504 is a less stringent causation standard.

[141] 532 U.S. 275, 293.

22

This potentially has significant implications for Title II of the ADA—Title II's statutory language is almost entirely duplicative of § 504,[142] which was modeled after Title VI,[143] and Title II's disparate-impact language is also found only in its regulations.

Then, in the unreported decision *Kamps v. Baylor University*, the Fifth Circuit, relying on *Sandoval*, found that the Age Discrimination Act—whose language is similar to that of Title II—does not prohibit policies that have a disparate impact.[144] The *Kamps* Court distinguished the language of the Age Discrimination Act from that of Title VII of the Civil Rights Act and that of the Age Discrimination in Employment Act of 1967 ("ADEA"). Whereas Title VII's and the ADEA's statutory language prohibit policies that have a disparate impact, the Age Discrimination Act's statutory language does not.[145] Instead, the Age Discrimination Act's disparate-impact language is found only in its regulations.[146] Noting that the Age Discrimination Act's "prohibition is almost identical to Title VI of the Civil Rights Act, which prohibits only intentional discrimination," the Fifth Circuit found that "if a statutory provision prohibits only intentional discrimination . . . regulations adopted to effectuate the provision may be enforceable through its private cause of action only to the extent that they, too, prohibit intentional discrimination."[147]

---

[142] *Compare* 42 U.S.C. § 12132 ("[N]o qualified individual with a disability shall, by reason of such disability, be excluded from participation in or be denied the benefits of the services, programs, or activities of a public entity, or be subjected to discrimination by any such entity.") *with* 29 U.S.C. § 794 ("No otherwise qualified individual with a disability in the United States . . . shall, solely by reason of her or his disability, be excluded from the participation in, be denied the benefits of, or be subjected to discrimination under any program or activity receiving Federal financial assistance . . . .").

[143] *United States v. Baylor Univ. Med. Ctr.*, 736 F.2d 1039, 1043 (5th Cir. 1984) ("[Section] 505(a)(2) of the Rehabilitation Act points directly to Title VI as a model for Section 504 . . . ." (internal citations omitted)).

[144] 592 F. App'x 282, 285 (5th Cir. 2014).

[145] *Id.* at 286.

[146] *Id.*

[147] *Id.* (quoting *Ability Ctr. of Greater Toledo v. City of Sandusky*, 385 F.3d 901, 906 (6th Cir. 2004)); *see also Frame v. City of Arlington*, 657 F.3d 215, 224 (5th Cir. 2011) ("Moreover, to the extent Title II's implementing regulations 'simply apply' Title II's substantive ban on disability discrimination and do not prohibit conduct that Title II permits, they too are enforceable through Title II's private right of action." (citing *Alexander v. Sandoval*, 532 U.S. 275, 285 (2001))).

Not only does Title II's language nearly mirror that of the Age Discrimination Act's,[148] but examining Title II alongside Titles I and III yields results analogous to the *Kamp* Court's comparison of the Age Discrimination Act with Title VII and the ADEA. Title I (employment) and Title III (public accommodations) both contain disparate-impact language, but Title II does not; instead, the disparate-impact language found in Titles I and III is found only in the regulations of Title II.[149] And the principles of statutory interpretation instruct the Court to give weight to this omission: "[W]here Congress includes particular language in one section of a statute but omits it in another section of the same Act, it is generally presumed that Congress acts intentionally and purposely in the disparate inclusion or exclusion."[150] Further, to find that Title II also creates a private cause of action for disparate impact would render the disparate-impact language in Titles I and III superfluous, and this Court is "reluctan[t] to treat statutory terms as surplusage" in any setting.[151]

In short, where the Fifth Circuit has not held that a private right of action for disparate-impact liability exists under Title II, Title II's text indicates it does not, and Supreme Court precedent is indeterminate, this Court would be remiss to find that such a cause of action is

---

[148] *Compare* 42 U.S.C. § 12132 *with* 42 U.S.C. § 6102 ("Pursuant to regulations prescribed under section 6103 of this title, and except as provided by section 6103(b) and 6103(c) of this title, no person in the United States shall, on the basis of age, be excluded from participation in, be denied the benefits of, or be subjected to discrimination under, any program or activity receiving Federal financial assistance.").

[149] *Compare* 42 U.S.C. § 12112(b)(6) ("As used in subsection (a), the term "discriminate against a qualified individual on the basis of disability" includes . . . using qualification standards, employment tests or other selection criteria that screen out or tend to screen out an individual with a disability or a class of individuals with disabilities . . . ." *and* 42 U.S.C. § 12182(b)(2) ("For purposes of subsection (a), discrimination includes . . . the imposition or application of eligibility criteria that screen out or tend to screen out an individual with a disability or any class of individuals with disabilities . . . .") *with* 28 C.F.R. § 35.130(b)(8) ("A public entity shall not impose or apply eligibility criteria that screen out or tend to screen out an individual with a disability or any class of individuals with disabilities from fully and equally enjoying any service, program, or activity . . . .").

[150] *Russello v. United States*, 464 U.S. 16, 23 (1983) (quoting *United States v. Wong Kim Bo*, 472 F.2d 720, 722 (5th Cir. 1972)).

[151] *Babbitt v. Sweet Home Chapter of Communities for a Great Oregon*, 515 U.S. 687, 698 (1995); *United States v. Menasche*, 348 U.S. 528, 520 (1955) ("It is [a court's] duty 'to give effect, if possible, to every clause and word of a statute . . . .'" (quoting *Inhabitants of Montclair Twp. v. Ramsdell*, 107 U.S. 147, 152 (1883))). *See also Williams v. Taylor*, 529 U.S. 362, 404 (2000) (quoting *Ramsdell*, 107 U.S. at 152) (describing this rule as a "cardinal principle of statutory construction").

24

cognizable under Title II. Accordingly, O.E.'s ADA claim under the disparate-impact theory is not cognizable.

### b.   Conscious Discrimination or Disparate Treatment

O.E.'s ADA claim, however, does not end there because his complaint also contains allegations that implicate the disparate-treatment or conscious-discrimination and failure-to-accommodate theories. Both are avenues to ADA liability in the Fifth Circuit.[152]

Starting with the disparate-treatment claim, O.E. implies that Willow is using the Iowa Assessment as a pretext to exclude students with intellectual disabilities so that it receives a "windfall" in government funding. In his opposition, O.E. makes clear that he is not alleging disparate treatment in his personal experience through the admissions process. In other words, O.E. concedes that he was treated equally as other students going through the admissions process.[153] Because he abandons that argument, the Court will not analyze his ADA claim under that set of facts. Instead, the Court considers O.E.'s allegations that the use of the Iowa Assessment in Willow's admissions process is an illegal policy because it is being used to discriminate against or exclude students with disabilities.

It is undisputed that O.E. was "excluded" from Willow because he did not obtain the necessary score on the Iowa Assessment to be eligible for admission into Willow. The key inquiry for purposes of his ADA claim is whether such exclusion is "by reason of his disability." The "by reason of disability" element requires facts "making it 'plausible that he was discriminated against "because of"'—but not necessarily *solely* because of—his disability."[154] In other words, the

---

[152] *Carter as next of friend of Carter v. City of Shreveport*, 144 F.4th 809, 813 (5th Cir. 2025).
[153] R. Doc. 38 at 8.
[154] *Pickett v. Texas Tech Univ. Health Scis. Ctr.*, 37 F.4th 1013, 1033 (5th Cir. 2022) (quoting *Olivarez v. T-Mobile USA, Inc.*, 997 F.3d 595, 601 (5th Cir. 2021)).

"[d]isability-related animus 'need not be the sole reason' for the challenged decision."[155] Thus, O.E. must show a causal connection between his exclusion from Willow and his intellectual disability, but he need only show that the disability "play[ed] a role" in the exclusion and that it had "a determinative influence on the outcome."[156] Specifically, O.E. "must include facts that allow the court to reasonably infer that his disability affected the decision."[157] "After assuming those allegations to be true, [the court] must undertake a 'sensitive inquiry into such circumstantial and direct evidence of intent as may be available.'"[158]

Stripping away all legal conclusions, the complaint's factual allegations relevant to the ADA claim can be boiled down to the following: (1) Willow is a public charter school in a charter-school district that educates students in grades kindergarten through twelfth and has elected to establish itself as its own LEA;[159] (2) Willow is receiving "per pupil" funding from the government, some of which is dedicated to serving students with disabilities;[160] (3) Willow currently has no students with "profound cognitive disabilities requiring a special-education curriculum;"[161] (4) Willow requires all students applying for admission to sit for an academic achievement assessment called the Iowa Assessment;[162] and (5) prospective students must attain a minimum score on this assessment or else be disqualified from continuing with the admissions process.[163] O.E. alleges that this creates a "windfall" in government funding for Willow, implying that Willow is intentionally or consciously excluding students with intellectual disabilities for

---

[155] *Pickett*, 37 F.4th at 1033 (quoting *Soledad v. U.S. Dep't of Treasury*, 304 F.3d 500, 503 (5th Cir. 2002) (quoting *Ahrens v. Perot Sys. Corp.*, 205 F.3d 831, 835 (5th Cir. 2000))).
[156] *Pickett*, 37 F.4th at 1033 (quoting *Soledad*, 304 F.3d at 503–04).
[157] *Pickett*, 37 F.4th at 1033 (citing *Olivarez*, 997 F.3d at 601).
[158] *Pickett*, 37 F.4th at 1033 (quoting *Vill. of Arlington Heights v. Metro. Hous. Dev. Corp.*, 429 U.S. 252, 266 (1977)).
[159] R. Doc. 1 ¶¶ 6, 46.
[160] *Id.* ¶¶ 62–63.
[161] *Id.* ¶ 65.
[162] *Id.* ¶ 83.
[163] *Id.* ¶ 85.

26

financial gain.[164] But this cleverly pled narrative requires the Court to make the sort of inferential leap that is prohibited by *Twombly* and *Iqbal*.

Although it is possible that Willow may have adopted the Iowa Assessment, at least in part, to exclude students with intellectual disabilities, without more, it is only "merely consistent with" liability and "stops short of the line between possibility and plausibility."[165] That is because, when drawing on experience and common sense, there are "more likely explanations" for Willow's decision to use an achievement assessment in its admissions process.[166] Namely, accepting the windfall theory would require this Court to ignore the generally known fact that there exist elementary and high schools with additional academic admission requirements, which is especially pertinent given that Louisiana law allows such schools.[167] Although the general legality of such schools or such admissions practices has been a topic of discussion, that issue is not the one presently before this Court.[168] The issue here is a much narrower one: whether O.E. has plausibly alleged that the exclusion of students with intellectual disabilities played a role in Willow's decision to use the Iowa Assessment in its admissions process. And he has not.

That is because O.E. pleads no *facts* suggesting students with an intellectual disability played a role in Willow's decision to use the Iowa Assessment in its admissions process. He includes allegations that attempt to paint Willow in a sinister light, but these allegations collapse

---

[164] *Id.* ¶ 63.

[165] *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (quoting *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 557 (2007)).

[166] *See Iqbal*, 556 U.S. at 663–64, 681–82.

[167] *See* La. Stat. Ann. §§ 17:3991(B)(3). *See also C.O. v. Portland Pub. Schs.*, 679 F.3d 1162, 1169–70 (9th Cir. 2012) ("In particular, Congress has explicitly contemplated that public school districts might create magnet and charter programs. . . . Hundreds of school districts have taken advantage of these procedures, many creating schools with competitive admissions policies more stringent than those here. And yet, we know of no case holding such institutions liable for violations of the ADA or Rehabilitation Act.").

[168] *See, e.g.*, Suzanne E. Eckes & Jonathan A. Plucker, *Charter Schools and Gifted Education: Legal Obligations*, 34 J.L. & Educ. 421 (2005); Janet R. Decker, J.D., Ph.D. (ABD), Suzanne E. Eckes, J.D., Ph.D., & Jonathan A. Plucker, Ph.D., *Charter Schools Designed for Gifted and Talented Students: Legal and Policy Issues and Considerations*, 259 Ed. Law Rep. 1 (2010); Jay P. Heubert, *Schools Without Rules? Charter Schools, Federal Disability Law, and the Paradoxes of Deregulation*, 32 Harv. C.R.-C.L. L. Rev. 301 (1997). *But see C.O.*, 679 F.3d at 1169–70.

under closer scrutiny. First, he alleges that, "prior to 2015," Willow, when it was known as "Lusher," was forced by the state attorney general to disclose the name of its prior admissions assessment after it had initially refused to do so.[169] While such alleged "secrecy" may be suspect, this isolated incident occurred ten plus years ago when Willow operated under a different name, involved a different assessment, and possibly occurred under different leadership. Thus, its relevance here is attenuated. Second, he alleges that "Willow has also used confusing and Kafkaesque procedures" that were allegedly "designed to weed out certain families," such as "refusing to accept applications from 11 a.m. to 1 p.m."[170] Not only is much of this allegation conclusory, but it too concerns events that took place ten plus years ago. Further, it is unclear how these "confusing and Kafkaesque" procedures target families who have intellectually disabled children. Such remote allegations do not support an inference that students with intellectual disabilities played a role in Willow's decision to use the Iowa Assessment in its admissions process.[171]

Also relevant, O.E., who admits that the Iowa Assessment is an achievement test,[172] alleges that "[t]he IOWA assessment is an examination that identifies a student's 'intelligence level' or identifies a student as a 'student with an exceptionality.'"[173] But as a matter of ordinary meaning, an achievement test is distinct from a test that measures intelligence. Generally, an achievement test measures what someone has done, that is, what he or she has learned, while a test that assesses for intelligence measures what someone can do, that is, one's potential or ability to learn. O.E.

---

[169] R. Doc. 1 ¶¶ 87–89.

[170] *Id.* ¶¶ 90–91.

[171] *See Iqbal*, 556 U.S. at 679 ("A claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged.").

[172] R. Doc. 1 ¶ 83 ("As noted, Willow requires all students applying for admissions (even kindergarteners) to sit for an achievement 'assessment,' called the IOWA assessment."); *see also* R. Doc. 1 at 1 ("Instead, it accepts only those who obtain a certain score on a 3-hour 'assessment,' an achievement test called the 'IOWA assessment.'").

[173] *Id.* ¶ 134.

contends that this distinction is "legally irrelevant" because "[r]egardless of what label one attaches to the assessment, the outcome is the same: O.E. cannot achieve the minimum score because of his disability."[178] But the distinction *is* relevant: an intelligence test is ordinarily designed to measure general cognitive ability, the defining characteristic of the disability at issue, while an achievement test is ordinarily designed to measure mastery of specific academic content typically acquired through academic instruction.[179] Although some level of cognitive ability is needed to "pass" an achievement test, the achievement test measures much more, namely a student's mastery of academic content, which experience and common sense tell us is affected by a host of factors, like prior schooling, parental involvement, home life, personality traits, et cetera. If Willow were to use an intelligence test in its admissions process, then it would be plausible to say it was excluding children based on intellectual disability because Willow would be assessing for the very defining feature of the disability. But by using an academic achievement test, Willow is assessing for mastery of academic content.

Even though O.E. alleges that the Iowa Assessment "identifies a student's 'intelligence level' or identifies a student as a 'student with an exceptionality,'" he also alleges that the Iowa Assessment measures reading and math.[180] And in his opposition, he supports this allegation, explicitly stating that the Iowa Assessment "is a multiple-choice exam that tests a child's ability

---

[178] R. Doc. 38 at 15.

[179] *Compare Hall v. Fla.*, 572 U.S. 701, 710–14 (2014) ("In the context of a formal assessment, '[t]he existence of concurrent deficits in intellectual and adaptive functioning has long been the defining characteristic of intellectual disability.'") (defining *intellectual disability* according to three criteria, one of which is significantly subaverage intellectual functioning, and explaining that intellectual functioning is usually measured with a standardized intelligence test) *with Montgomery v. Starkville Mun. Separate Sch. Dist.*, 665 F. Supp. 487, 495 (N.D. Miss. 1987), *aff'd,* 854 F.2d 127 (5th Cir. 1988) (noting that "[s]tudents are required to take an achievement test once a year to determine how well they are learning the material taught in class"). *See also Simpson v. Quarterman*, 593 F. Supp. 2d 922, 937 (E.D. Tex. 2009) (noting that "grades and achievement test scores do not measure IQ").

[180] R. Doc. 1 ¶ 117 ("O.E.'s scores on the IOWA assessment were as follows: 8 percentile in reading; 2 percentile in math.").

in reading, math, and various other subjects, as compared to their peers."[181] This is a textbook description of an academic achievement test, and besides O.E.'s blanket assertion that the test identifies a student's intelligence or exceptionalities, there are no factual allegations that allow this Court to reasonably infer that the Iowa Assessment measures intelligence. That is, there are no facts showing how or why that is so. Therefore, this Court cannot reasonably infer that Willow is measuring applicants' intelligence or general cognitive ability. In sum, O.E. has not plausibly alleged that Willow's use of the Iowa Assessment in its admissions process is connected to the disability in question in a manner that would support an inference of conscious discrimination and thus has failed to adequately plead a conscious-discrimination or disparate-treatment claim.

### c.    Failure to Accommodate

In addition to its prohibition on disability discrimination, Title II also imposes an "affirmative obligation" on public entities to make "reasonable modifications to rules, policies, or practices" for disabled individuals,[182] "unless the entity can show that a modification would 'fundamentally alter the nature' of the service or program it offers."[183] Accordingly, "[t]he failure-to-accommodate theory augments the last element of the general ADA claim such that discrimination 'by reason of his disability' is established 'by showing that the disability and its consequential limitations were known by the covered entity, and the entity failed to make reasonable accommodations.'"[184] "But Title II 'does not require States to compromise their essential eligibility criteria for public programs'—'[i]t requires only reasonable modifications,' and 'only when the individual seeking modification is otherwise eligible for service.'"[185]

---

[181] R. Doc. 38 at 3 (citing R. Doc. 1 ¶ 117).
[182] 42 U.S.C. § 12131(2). *See also Bennett-Nelson v. Louisiana Bd. of Regents*, 431 F.3d 448, 454 (5th Cir. 2005).
[183] *Block v. Texas Bd. of L. Examiners*, 952 F.3d 613, 618 (5th Cir. 2020).
[184] *Carter as next of friend of Carter v. City of Shreveport*, 144 F.4th 809, 814 (5th Cir. 2025).
[185] *Block*, 952 F.3d at 618 (quoting *Tennessee v. Lane*, 541 U.S. 509, 532 (2004)).

To succeed on a failure-to-accommodate claim, a plaintiff must show that in addition to being a qualified individual with a disability, that "the disability and its consequential limitations were known by the covered entity; and the entity failed to make reasonable accommodations."[186] The "knowledge requirement is satisfied when either (1) the plaintiff 'specifically identif[ies] the disability and resulting limitations' and . . . request[s] an accommodation in 'direct and specific' terms,' or (2) 'the disability, resulting limitation[s], and necessary reasonable accommodation' were 'open, obvious, and apparent' to the entity's relevant agents."[187]

The knowledge element is plainly satisfied by O.E.'s allegations. Willow had knowledge of O.E.'s disability and resulting limitations when O.E.'s father sent Willow O.E.'s IEP, along with "myriad medical documents" and a note from O.E.'s pediatrician.[188] Additionally, O.E. requested the sought-after accommodation in terms that could not be any more direct or specific by explicitly asking Willow to waive the assessment.[189] It is undisputed that O.E. received accommodations on the assessment, but in his opposition, O.E. makes clear that he is only concerned with waiver of the assessment itself.[190] Thus, whether O.E. states a plausible claim for relief under this theory boils down to whether waiver of the Iowa Assessment is reasonable.[191]

"An accommodation is reasonable if 'it does not impose undue financial or administrative burdens or fundamentally alter the nature of the service, program, or activity.'"[192] Although the public-entity defendant may raise fundamental alteration or undue burden as a defense, the plaintiff

---

[186] *Pickett v. Texas Tech Univ. Health Scis. Ctr.*, 37 F.4th 1013, 1032 (5th Cir. 2022) (quoting *Smith v. Harris Cnty.*, 956 F.3d 311, 317 (5th Cir. 2020)).
[187] *Carter as next of friend of Carter*, 144 F.4th at 814.
[188] R. Doc. 1 ¶¶ 105–06.
[189] *Id.* ¶¶ 95–96.
[190] R. Doc. 38 at 13–14.
[191] *Bennett-Nelson v. Louisiana Bd. of Regents*, 431 F.3d 448, 455 (5th Cir. 2005) ("[T]he existence of a violation depends on whether under . . . the ADA, the demanded accommodation is in fact reasonable and therefore required.").
[192] *Smith v. Harris Cnty., Texas*, 956 F.3d 311, 317 (5th Cir. 2020) (quoting *Cadena v. El Paso Cnty.*, 946 F.3d 717, 724 (5th Cir. 2020) (quoting 28 C.F.R. § 35.130(b)(7))).

"bears the burden of showing that he requested the accommodation and that it was reasonable."[193] Because O.E.'s requested accommodation is waiver of an eligibility criterion, however, O.E.'s failure-to-accommodate claim is inextricably linked with the question of whether O.E. is "qualified" to attend Willow.

Title II applies only to "qualified individual[s] with a disability." An individual with a disability is "qualified" if he "meets the *essential* eligibility requirements" "with or without reasonable modifications to rules, policies, or practices[.]"[194] Accordingly, "an individual does not need to satisfy non-essential program requirements to be 'otherwise qualified.'"[195] "A requirement is 'essential' if 'the nature of the program would be fundamentally altered' without it."[196] "Courts have therefore reasoned that essential eligibility requirements, unlike 'rules, policies, [and] practices,' . . . are not subject to reasonable modification or waiver."[197] Thus, whether waiver of the Iowa Assessment is a "reasonable modification" to Willow's admissions policy speaks directly to whether O.E. is "qualified" to attend Willow. If obtaining the minimum score on the Iowa Assessment is an "essential" requirement, then waiver of the assessment is not "reasonable," as waiver would result in a fundamental alteration of the program. Thus, the inquiry starts with whether waiver of the Iowa Assessment is an "essential" eligibility requirement.

The Fifth Circuit explored what makes an eligibility requirement essential when analyzing a § 504 disability discrimination claim in *Shaikh v. Texas A&M University College of Medicine*.[198] At the motion-to-dismiss stage, the *Shaikh* Court sought to determine whether a medical school student had satisfied a medical school program's "essential" requirements, namely, whether

---

[193] *Block v. Texas Bd. of L. Examiners*, 952 F.3d 613, 618 (5th Cir. 2020).
[194] 42 U.S.C. § 12131(2) (emphasis added).
[195] *Shaikh v. Texas A&M Univ. Coll. of Med.*, 739 F. App'x 215, 220 (5th Cir. 2018) (omitting citations).
[196] *Id.* (citing *Mary Jo C. v. New York State & Loc. Ret. Sys.*, 707 F.3d 144, 158 (2d Cir. 2013)).
[197] *Mary Jo C.*, 707 F.3d at 156.
[198] 739 F. App'x at 220–21.

passing a required exam by the end of a certain time period was an "essential requirement" or just "*a* requirement." [199] In finding that passing the exam in a timely manner was not essential, the *Shaikh* Court noted that "nothing on the face of his complaint establishes that doing so was an 'essential' requirement of the program."[200]

Conversely, here, the facts alleged in the complaint tend to establish that the Iowa Assessment is an "essential" requirement of Willow's program. O.E. alleges that "Willow requires all students applying for admission (even kindergarteners)" to sit for the Iowa Assessment.[201] He further alleges that prospective students must attain the minimum score or else be disqualified and that "a student's score on the IOWA assessment makes up the largest share of the possible point total" for a student's matrix score.[202] And "[t]he higher [an applicant] scores, the higher [an applicant's] chances of admission."[203] Thus, the very mechanism that Willow uses to determine eligibility prioritizes an applicant's score on the Iowa Assessment more than any other eligibility requirement. The fact that this criterion constitutes the largest component of the eligibility matrix strongly suggests that it is central to the admissions determination, as opposed to a peripheral consideration. This in turn suggests the assessment criterion is fundamental to the nature of Willow's program. Accordingly, it is speculative whether O.E. is even "qualified" to attend Willow.[204]

Even assuming O.E. is a qualified individual, O.E. has failed to plausibly allege that waiver of the Iowa Assessment is reasonable. By its definition, the reasonableness determination requires an inquiry into the nature of Willow's program, but O.E. alleges no facts whatsoever regarding

---

[199] *See id.*
[200] *Id.*
[201] R. Doc. 1 ¶ 83.
[202] R. Doc. 1 ¶¶ 85, 92.
[203] *Id.* ¶ 94.
[204] *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 555 (2007) ("Factual allegations must be enough to raise a right to relief above the speculative level.").

Willow's program. This is especially relevant where a purpose of charter schools in Louisiana is to support innovation, which necessarily permits such schools to pursue educational missions that differ from those of traditional public schools.

Further, Louisiana law requires charter schools to have a mission, and, to that end, allows certain charter schools to use admissions requirements that "incorporate[] achievement of a certain academic record" if those admissions requirements are "related to the school's mission, scope, or role."[205] But the complaint is completely devoid of any facts regarding Willow's mission, purpose, role, or scope; in fact, outside of his allegation that all of Willow's students require only a general education curriculum, O.E. provides no facts whatsoever about the school's curriculum, instruction, or program. Also, he provides no substitute to the Iowa Assessment criterion, such as consideration of O.E.'s past grades in its place, and thus complete waiver would give O.E. a distinct advantage over his peers, who are required to take the assessment and obtain the requisite score.[206] Thus, O.E. has established no facts allowing this Court to draw a reasonable inference that waiving the Iowa Assessment is a reasonable accommodation.

In his opposition, O.E. argues that the assessment is not "necessary" because Willow's "testing requirement is not a 'necessary' condition of educating students."[207] But this statement is completely devoid of law and context. At this level of generality, almost no condition is "necessary" to educate a student; taken to its logical conclusion, O.E.'s argument would eliminate all discretionary admissions criteria in public education, even at the postsecondary education level, on the theory that education can occur without them. O.E. also contends that "[i]t would be absurd for Willow to argue that screening out students is 'necessary' when the school explicitly agreed to

---

[205] La. Stat. Ann. § 17:3991(B)(3).
[206] *See Hammel v. Eau Galle Cheese Factory*, 407 F.3d 852, 867 (7th Cir. 2005) ("Accommodations which require special dispensations and preferential treatment are not reasonable under the ADA . . . .").
[207] R. Doc. 38 at 11.

educate students with intellectual disabilities under federal and state law."[208] This argument, however, is circular because it assumes that Willow's use of the Iowa Assessment violates the ADA.

Finally, O.E. asserts that "[w]hile Willow did make modifications to its usual 'policies, practices, or procedures,' . . . the issue here is more fundamental, as the 'eligibility criteria' itself 'screen[s] out or tend[s] to screen out' intellectually disabled students . . . ."[209] "In other words," he asserts, "no amount of accommodations or modifications—short of waiving the test altogether—could ever eliminate the discriminatory effect."[210] Thus, according to O.E., "the 'modifications' that Willow provided were not 'reasonable.'"[211] But O.E. is mistaken: the law is clear—reasonableness is *not* the same as effectiveness. That is, whether an accommodation is reasonable does not depend on how well it accommodates the handicapped individual; instead, it concerns the effect the requested accommodation has on the entity providing the accommodation.[212] Further, this argument is an attempt to repackage the disparate-impact claim as a failure-to-accommodate claim.[213] In making this argument, O.E. effectively seeks to invalidate the eligibility criterion because of its alleged screening-out effect. But a failure-to-accommodate claim presupposes that some reasonable modification will allow plaintiff meaningful access to the program. By conceding that no accommodation or modification will suffice, O.E.'s failure-to-accommodate claim collapses into a challenge to the policy itself, *i.e.*, a disparate-impact claim.

---

[208] *Id.*

[209] *Id.* at 13 (citing 28 C.F.R. § 35.130(b)(7)–(8)).

[210] *Id.* at 13.

[211] *Id.* (citing 28 C.F.R. § 35.130(b)(7)).

[212] *See Smith v. Harris Cnty., Texas*, 956 F.3d 311, 317 (5th Cir. 2020) (explaining that an accommodation is reasonable if it does not impose undue burdens on the public entity or fundamentally alter the nature of the entity's program, service, or activity).

[213] *See Sosa v. Massachusetts Dep't of Correction*, 80 F.4th 15, 31 (1st Cir. 2023) ("[A] reasonable accommodation claim focuses on 'an individualized request or need' for a reasonable modification, while a disparate impact claim alleges a more 'systemic' obstacle to access." (citing *Payan v. Los Angeles Cmty. Coll. Dist.*, 11 F.4th 729, 738 (9th Cir. 2021)).

In short, although a "Rule 12(b)(6) motion to dismiss is not well suited to th[e] type of evidence-intensive inquiry" implicated by a failure-to-accommodate claim, O.E. must still clear *Twombly* and *Iqbal*'s plausibility hurdle.[214] And for the reasons stated above, the Court finds that O.E. has not.

### ii.   Wheelchair Accessibility of Willow's Lower-School Campus

O.E.'s wheelchair-accessibility claim must meet the same three-element test applicable to all Title II claims.[215] If Willow's program is not readily accessible to a qualified individual with a disability because its facilities are not wheelchair accessible, and thus that individual is excluded from Willow by reason of his disability, the individual will have stated a claim under the ADA for wheelchair accessibility.[216]

Even assuming O.E. is qualified to attend Willow, he does not sufficiently plead that Willow's facilities are wheelchair inaccessible and thus fails on the "by reason of disability" element. In his attempt to plead that Willow's lower-school campus is wheelchair inaccessible, he plainly alleges, multiple times, that "Willow's lower-school campus is not wheelchair accessible."[217] But such an allegation is a legal conclusion dressed up as a factual assertion and not entitled to the assumption of truth.[218] O.E. does not point to facts showing *how* the lower-school campus is inaccessible.[219] He further alleges that the inaccessibility of the lower-school campus is the reason he took the assessment at Willow's middle-school campus, but again, there

---

[214] *Shaikh v. Texas A&M Univ. Coll. of Med.*, 739 F. App'x 215, 221 n.6 (5th Cir. 2018).
[215] *See Greer v. Richardson Indep. Sch. Dist.*, 472 F. App'x 287, 292 (5th Cir. 2012).
[216] *See id.*
[217] R. Doc. 1 ¶ 116; *see also* R. Doc. 1 ¶¶ 139, 141.
[218] *See Ashcroft v. Iqbal*, 556 U.S. 662, 678–79 (2009) (quoting *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 555 (2007)).
[219] *Iqbal*, 556 U.S. at 678 ("Nor does a complaint suffice if it tenders 'naked assertion[s]' devoid of 'further factual enhancement.'" (quoting *Twombly*, 550 U.S. at 557)); *see also S. Christian Leadership Conf. v. Supreme Ct. of State of La.*, 252 F.3d 781, 786 (5th Cir. 2001) ("[C]onclusory allegations or legal conclusions masquerading as factual conclusions will not suffice to prevent a motion to dismiss." (quoting *Fernandez-Montes v. Allied Pilots Ass'n*, 987 F.2d 278, 284 (5th Cir. 1993))).

are no facts showing *why* O.E. could not physically take the assessment at the lower-school campus. Were the lower-school classrooms inaccessible by wheelchair because they were only reachable by stairs? Were the lower-school classrooms inaccessible because they were unable to fit a wheelchair? These are possible reasons for having O.E. take the assessment at the middle-school campus, but there are innumerable "obvious alternative explanations" having nothing to do with wheelchair accessibility, such as staffing and personnel issues, space constraints at the lower-school due to contemporaneously occurring school functions, or construction or repairs being done at the lower-school campus.[220] Therefore, where the motion-to-dismiss standard "asks for more than a sheer possibility that a defendant has acted unlawfully," the Court cannot find that O.E.'s wheelchair allegations are sufficient to survive a motion to dismiss, and thus he has failed to plead a Title II claim based on wheelchair inaccessibility of Willow's lower-school campus.

For the foregoing reasons, O.E.'s ADA claim cannot survive Rule 12(b)(6), and dismissal is warranted. But because the Court cannot conclude at this stage that—excluding the disparate-impact claim—amendment would be futile, the Court will permit O.E. an opportunity to file an amended complaint under Title II of the ADA.

### D. State Law Claims

The Court possesses federal subject matter jurisdiction over the federal law claims under 28 U.S.C. § 1331 and thus exercised supplemental jurisdiction over the state law claims, including the claim brought pursuant to the LHRA, under 28 U.S.C. § 1367(a). But § 1367 also allows a district court to decline the exercise of supplemental jurisdiction in certain circumstances when exercising supplemental jurisdiction may be imprudent.

---

[220] *See Pickett v. Texas Tech Univ. Health Scis. Ctr.*, 37 F.4th 1013, 1034 (5th Cir. 2022) ("Plausibility just requires that there is no 'obvious alternative explanation' for the decision.") (citing *Iqbal*, 556 U.S. at 682).

Where "all federal claims have been eliminated[,]" the "district court has 'wide discretion' in deciding whether to retain jurisdiction over state law claims . . . ."[221] Indeed, in the Fifth Circuit, the "general rule is to dismiss state claims when the federal claims to which they are pendent are dismissed."[222] But that rule is "neither mandatory nor absolute," and the district court must "analyze the statutory and common law factors that are relevant to the question of its jurisdiction over pendent state law claims."[223]

The relevant statutory factors are those circumstances found in section 1367(c), including "(1) whether the state claims raise novel or complex issues of state law; (2) whether the state claims substantially predominate over the federal claims; (3) whether the federal claims have been dismissed; and (4) whether there are exceptional circumstances or other compelling reasons for declining jurisdiction."[224] "The common law factors . . . include judicial economy, convenience, fairness, and comity."[225] "These interests are to be considered on a case-by-case basis, and no single factor is dispositive."[226]

Here, the second and third statutory factors collapse into each other and heavily weigh in favor of dismissal, especially given the Fifth Circuit's general rule articulated above.[227] Because all federal claims have been dismissed (the third factor), the state law claims wholly predominate over the non-existent federal law claims (the second factor). The first factor also tips the scales

---

[221] *Enochs v. Lampasas Cnty.*, 641 F.3d 155, 161 (5th Cir. 2011) (citing *Guzzino v. Felterman*, 191 F.3d 588, 595 (5th Cir. 1999)).

[222] *Parker & Parsley Petroleum Co. v. Dresser Indus.*, 972 F.2d 580, 585 (5th Cir. 1992) (citing *Wong v. Stripling*, 881 F.2d 200, 204 (5th Cir. 1989)).

[223] *Enochs*, 641 F.3d at 160–61.

[224] *Francis v. Louisiana*, No. CV 21-706, 2022 WL 1134935, at *2 (E.D. La. Apr. 18, 2022) (Vance, J.) (quoting *Enochs*, 641 F.3d at 158–59 (citing 28 U.S.C. § 1367(c))).

[225] *Enochs*, 641 F.3d at 159.

[226] *Mendoza v. Murphy*, 532 F.3d 342, 346 (5th Cir. 2008) (citing *Parker & Parsley Petroleum Co.*, 972 F.2d at 587).

[227] *See Smith v. Amedisys Inc.*, 298 F.3d 434, 447 (5th Cir. 2002) ("Considering the second and third factors, our analysis above affirms the trial court's dismissal of the only federal claims alleged. Thus, the state law claims now predominate over the nonexistent federal claims.").

38

toward dismissal because this case potentially involves statutory interpretation questions regarding Louisiana's charter school law.[228] Therefore, the balance of the statutory factors weighs in favor of dismissal.

The common law factors too support dismissal. First, judicial economy would not be served by retaining jurisdiction over the LHRA and negligence claims because this case is still in its early stages and has mainly involved only early-stage pleadings.[229] Although a preliminary injunction hearing was held, that hearing concerned only the federal law claims. Second, dismissal will likely not cause undue inconvenience to the litigants because it is unlikely that much discovery has been completed at these early stages, and the applicable state court, along with the parties, evidence, and witnesses, are all located in New Orleans, Louisiana.[230] Third, and in that same vein, the parties will likely not be unduly prejudiced by dismissal; as just indicated, the parties probably will not have to repeat much of the effort and expense of the discovery process.[231] Further, O.E. will have the same amount of time to file his state suit as he had to file his federal suit because, under Louisiana law, the entire prescriptive period runs anew from the date of dismissal if a suit is involuntarily dismissed without prejudice.[232] Additionally, "allowing Louisiana courts to rule on Louisiana law encourages fairness between the parties 'by procuring them a surer-footed reading of applicable law.'"[233] Finally, comity considerations only further favor dismissal as "[t]he

---

[228] *See* R. Doc. 30-1 at 18–19.

[229] *See Parker & Parsley Petroleum Co.*, 972 F.2d at 587–88.

[230] *See Hicks v. Austin Indep. Sch. Dist.*, 564 F. App'x 747, 749 (5th Cir. 2014) (per curiam) (comparing locations of federal and state courthouses when balancing common law factors).

[231] *See Parker & Parsley Petroleum Co.*, 972 F.2d at 588.

[232] *Henry v. Sw. Airlines*, 23-522 (La. App. 5 Cir. 7/31/24), 392 So. 3d 1176, 1182, *writ denied*, 2024-1081 (La. 11/20/24), 396 So. 3d 68 (citing Louisiana appellate court cases and a Louisiana Supreme Court case); *see also Artis v. D.C.*, 583 U.S. 71, 88 (2018) (explaining that in some cases, the state-law tolling period "undoubtedly will" be longer than § 1367(d)'s 30-day grace period, like Louisiana, which "provides that after dismissal the limitations period 'run anews'" (citing La. Civ. Code Ann. arts. 3462, 3466 (West 2007))).

[233] *Watt v. New Orleans City*, 647 F. Supp. 3d 496, 507 (E.D. La. 2022), *aff'd*, No. 23-30050, 2023 WL 6807033 (5th Cir. Oct. 16, 2023) (citing *Fountain v. New Orleans City*, No. CV 18-145, 2018 WL 3475375, at *2 (E.D. La. July 19, 2018) (quoting *United Mine Workers of Am. v. Gibbs*, 383 U.S. 715, 726 (1966))).

federal courts are courts of limited jurisdiction, and often are not as well equipped for determinations of state law as are state courts."[234] Given that both the statutory and common law factors weigh in favor of dismissal, this Court declines to exercise supplemental jurisdiction over O.E.'s remaining state law claims.

### III.      PRELIMINARY INJUNCTION

Having addressed the motion to dismiss, the Court now turns to O.E.'s motion for preliminary injunction.[235] "A court considering a motion to dismiss and a motion for preliminary injunction simultaneously will commonly deny the motion for a preliminary injunction as moot if it determines dismissal is appropriate."[236] Given the nature of this case, namely its compressed timeline and the likelihood of an appeal, it is worth separately addressing the motion for preliminary injunction.[237]

In his motion, O.E. seeks to enjoin Willow from "using an 'achievement' test as a criteria in admissions."[238]  In response, Willow incorporates, and relies largely on, its motion to dismiss and memorandum in support of the motion.[239] At the preliminary injunction hearing, Willow also purported to make new arguments, including O.E.'s lack of standing under the ADA. The Court declines to consider these arguments, as they were raised for the first time at the hearing.

#### A.  Legal Standard

"A preliminary injunction is an 'extraordinary and drastic remedy . . . ."[240] As such "[t]he decision to grant a preliminary injunction is to be treated as the exception rather than the rule."[241]

---

[234] *Parker & Parsley Petroleum Co.*, 972 F.2d at 588–89 (internal citation omitted).
[235] R. Doc. 16.
[236] *Orbit Sports LLC v. Taylor*, 546 F. Supp. 3d 832, 850 (D. Minn. 2021).
[237] *See id.*
[238] *Id.*
[239] R. Doc. 27 at 3.
[240] *Munaf v. Geren*, 553 U.S. 674, 689 (2008).
[241] *Mississippi Power & Light Co. v. United Gas Pipe Line Co.*, 760 F.2d 618, 621 (5th Cir. 1985).

"It should only be granted if the movant has clearly carried the burden of persuasion" on the following four prerequisites:

> (1) a substantial likelihood that the plaintiff will prevail on the merits, (2) a substantial threat that irreparable injury will result if the injunction is not granted, (3) that the threatened injury outweighs the threatened harm to the defendant, and (4) that granting the preliminary injunction will not disserve the public interest.[242]

"The purpose of a preliminary injunction is merely to preserve the relative positions of the parties until a trial on the merits can be held."[243] "Given this limited purpose, and given the haste that is often necessary if those positions are to be preserved, a preliminary injunction is customarily granted on the basis of procedures that are less formal and evidence that is less complete than in a trial on the merits."[244] Thus, "the findings of fact and conclusions of law made by a court granting a preliminary injunction are not binding at trial on the merits."[245]

### B. Factual Findings

Based on the evidence presented at the preliminary injunction hearing, including witness testimony and admitted exhibits, the Court makes the following findings. These findings are made solely for purposes of the Court's preliminary injunction analysis and do not constitute final findings of fact on the merits.

### i. NOLA-PS

The additional facts presented at the preliminary injunction hearing provide fuller context of Willow's role as a school within Orleans Parish. New Orleans Public Schools ("NOLA-PS"), which is described as a "community of schools," is a unique public school system.[246] It is made

---

[242] *Id.* (citing *Canal Auth. of State of Fla. v. Callaway*, 489 F.2d 567 (5th Cir. 1974)).
[243] *Univ. of Texas v. Camenisch*, 451 U.S. 390, 395 (1981).
[244] *Id.*
[245] *Id.*
[246] R. Doc. 71 at 61:7–10; R. Doc. 67-11.

up almost entirely of public charter schools. In fact, out of NOLA-PS's 60-plus schools, only one school is a "direct-run" school, meaning only one is a traditional public school run directly by OPSB; the rest are charter schools.[247]

In a traditional public school district, public charter schools that are their own LEAs are generally independent of the school district in which they may be located.[248] That is, unless local or state law dictates otherwise, charter-school LEAs are generally not answerable to the local school board or its policies and procedures.[249] In the typical school district, then, charter-school LEAs are their own islands, acting like miniature independent school districts. But because of the unique nature and make-up of NOLA-PS, charter schools in Orleans Parish have a different relationship with the local school board, OPSB.[250] OPSB, which is an elected governing board, sets policies for all schools in Orleans Parish—charter and direct-run alike—and the Superintendent of OPSB is responsible for overseeing administration of those policies.[251] While NOLA-PS public charter schools retain much autonomy in their day-to-day operations, much like public charter schools in typical school districts, OPSB's policies govern three key areas: authorization and renewal of charters, student enrollment, and facilities.[252] This hybrid system allows NOLA-PS to operate as a district of choice, meaning families are not confined to their neighborhood school.[253] Instead, they may apply to any school or schools within the district through the centralized application and enrollment process governed by OPSB, known as the NOLA-PS Common Application Process, or "NCAP."[254]

---

[247] R. Doc. 71 at 62:1–4.
[248] *Id.* at 181:2–24.
[249] *Id.* at 181:18–21.
[250] *Id.* at 178:2–9.
[251] *Id.* at 45:3–22; R. Docs. 67-3, 67-11.
[252] R. Doc. 71 at 182:3–25.
[253] *Id.* at 178:12–25; *id.* at 179:1–20.
[254] *Id.* at 183:14–25.

To apply to Orleans Parish schools during the "main round" of admissions, a student completes a single online application through NOLA-PS's website.[255] On that application, the student can rank up to 12 schools based on their preferences.[256] While most schools—charter and direct-run alike—are "open-enrollment" schools, meaning they have no admissions criteria beyond the NCAP, three groups of schools have additional admissions criteria.[257] The first group includes schools, like Willow, that have academic eligibility criteria.[258] The second group includes language-immersion schools that require applicants to "pass" a language-proficiency test to remain eligible.[259] And the third group is a military and maritime academy that requires applicants to attend an open house and learn about the school's mission to remain eligible.[260] Thus, for those three groups of schools, applicants must complete an additional step to determine eligibility.[261] It goes without saying that if an applicant does not meet the requisite eligibility criteria, the student is no longer eligible to attend the respective school. Once an applicant's eligibility is determined, the school reports the applicant's eligibility status to OPSB.[262] OPSB then runs an algorithm-driven, lottery-type process where each applicant is assigned a random number. The process "matches" each student to a school using his or her number after considering the student's ranked schools, priorities, and eligibilities, along with the number of available seats in the applicable grade level at each ranked school.[263] Students then have the option to directly enroll in a school during

---

[255] *Id.*
[256] *Id.*
[257] *Id.* at 184:1–2.
[258] *Id.* at 184:2–5.
[259] *Id.* at 184:6–10.
[260] *Id.* at 184:11–15.
[261] *Id.* at 184:16–18.
[262] *Id.* at 184:18–21.
[263] *Id.* at 184:23–25; *id.* at 185:1–9.

43

the "open enrollment" period that follows the main round's matching process, provided there are available seats and they meet the school's eligibility criteria, if any.[264]

Every school authorized or directly run by OPSB must participate in the centralized enrollment process, even those schools with additional admissions criteria.[265] This system, which has been in effect since 2011, prevents families from receiving multiple offers and enables NOLA-PS schools to track and predict enrollment.[266] Overall, NOLA-PS's hybrid school system has proven successful for New Orleans's public school system, as schools and students are performing better than they were before Hurricane Katrina.[267]

### ii. Willow and Its Admissions Process

As previously noted, three groups of schools within NOLA-PS impose additional eligibility criteria that applicants must satisfy before they may be matched to those schools. These schools offer specialized programs and function as "magnet" schools.[268]  According to Willow's CEO, OPSB maintains a variety of magnet-style schools to ensure all the needs of Orleans Parish students are being met.[269]

Willow is part of a group of four schools with additional academic eligibility criteria.[270] These schools are referred to as "high academic" schools, whose curricula meets the needs of students "who require a challenge."[271] Willow's mission, specifically, is to provide "a developmentally appropriate learning environment in which high academics" and "comprehensive arts education . . . enable each child to achieve as a learner, a person, and a valuable member of

---

[264] *Id.* at 178:18–21.
[265] *Id.* at 186:15–19.
[266] *Id.* at 186:1–15.
[267] *Id.* at 179:20–24; 180:3–11.
[268] *Id.* at 46:10–19.
[269] *Id.* at 62:23-25; *id.* at 63:1–4.
[270] *Id.* at 198:2–4.
[271] *Id.* at 62:21–25; *id.* at 62:1

our society."[272] To ensure Willow is serving its high-academics and arts-focused mission, it provides a rigorous academic environment that focuses on the arts.[273] To ensure that students are ready for Willow's "rigorous experience" and arts program, Willow uses a "matrix" score in its application process that is composed of a reading score, a math score, a grade point average ("GPA") calculated from a previous report card, and an arts-interest profile.[274] Students earn "points" for each component of the matrix; some points are awarded based merely on completion, while some points are awarded based on performance.[275] For instance, if a student completes the arts-interest profile, he or she automatically receives three points upon submission of the application, but a student must obtain a minimum reading and math score or have a minimum GPA to obtain the requisite number of points necessary for eligibility.[276]

The reading and math score are obtained using an academic achievement assessment known as the Iowa Assessment.[277] The Iowa Assessment, which was previously given as the end-of-year state assessment in Louisiana to measure a student's academic growth, is a "norm-referenced" standardized assessment, meaning it is used to measure a student's academic improvement relative to peers in his grade level nationwide.[278] Thus, where a GPA based on prior grades from a previous school is a subjective measure of a student's performance in that particular academic environment, the Iowa Assessment is an objective measure that provides "real-time, non-biased information about a student's standing in the curriculum at the time of the test."[279] Significantly, the Iowa Assessment is not regarded as an IQ test, and Willow currently has students

---

[272] R. Doc. 67-3 at 49.
[273] R. Doc. 71 at 187:1–2; *id.* at 19–24.
[274] *Id.* at 187:1–19.
[275] *Id.*
[276] *Id.* at 187:14–19; 193:19–24.
[277] *Id.* at 193:19–24.
[278] *Id.* at 188:6–14; 112:13–7; 122:16–19.
[279] *Id.* at 125:17–25; 126:1–6.

who have tested in the borderline intellectual functioning range and are scoring "high" on their classroom assessments or on the annual state assessment.[280] Also, Willow's matrix process does not inquire about intellectual disabilities, and Willow's Admissions Director testified that there is no way of knowing how many applicants have an intellectual disability.[281] Further, Willow provides appropriate testing accommodations to those students who need them, but Willow has never waived the Iowa Assessment for any student.[282] Each applicant must meet each eligibility requirement and obtain the requisite amount of matrix points to be eligible for admission into Willow.[283]

Thus, coupled with OPSB's centralized enrollment system, a student may fail to be enrolled at Willow for a number of reasons, such as failing to complete Willow's application process, NOLA-PS's matching algorithm, or failing to obtain the requisite score on the Iowa Assessment. In any event, Willow has no way of knowing how many students with intellectual disabilities apply to but do not enroll in Willow and why.[284]

In 2022-2023, less than five percent of Willow's students had intellectual disabilities.[285] But other NOLA-PS charter schools also had extremely low percentages of students with intellectual disabilities, and notably, these schools are open-enrollment schools and thus do not have additional admissions criteria. For example, in 2022-2023, less than five percent of the students at Bricolage Academy had intellectual disabilities, and only six percent of students at Hynes Charter School had intellectual disabilities.[286]

---

[280] *Id.* at 126:11–20; 127:14–19.
[281] *Id.* at 190:25; *id.* at 191:1–25.
[282] *Id.* at 197:7–9; *id.* at 198:16–25.
[283] *Id.* at 199:1–17.
[284] *Id.* at 190:1–25; *id.* at 191:1–25.
[285] R. Doc. 67-5 at 8; R. Doc. 71 at 106:16–25; R. Doc. 71 at 107:4–25.
[286] R. Doc. 67-5 at 8.

### iii.   O.E. and His Experience with Willow's Admissions Process

O.E. is a nine-year-old boy who is physically and intellectually disabled.[287] He is nonverbal and uses an augmentative alternative communication ("AAC") device to communicate. Because of his intellectual disability, he has the cognitive functioning of a one- or two-year-old. While he can express basic wants and needs using his AAC device, he cannot recite the alphabet or answer questions such as two plus two.[288]

In mid-November 2025, O.E.'s father, C.E., reached out to Maggie Schodell, the Admissions Director at Willow.[289] C.E. provided a copy of O.E.'s most recent IEP and evaluation, dated from 2020 and obtained when O.E. was four years old. C.E. informed Schodell that because of the profoundness of O.E.'s disabilities, O.E. would never be able to "pass" the Iowa Assessment.[290] Therefore, C.E. requested a waiver of the assessment.[291] Schodell and C.E. exchanged email communications back and forth, as Schodell worked to get C.E. a response to his request for a waiver.[292] Meanwhile, O.E. and his parents completed the main round application for NOLA-PS, completed Willow's Supplemental Admissions Form, and scheduled O.E. to take the Iowa Assessment in mid-January.[293] A month after C.E.'s initial email, Schodell responded that Willow would not waive the assessment because Willow is "legally permitted" to have academic eligibility criteria in its admissions process. She also expressed that it was important to Willow that its admissions process remain fair and non-discriminatory and that to accommodate students with disabilities during the admissions assessment, the school is required to provide reasonable accommodations, "in lieu of an automatic waiver." Schodell also requested a "more recent

---

[287] R. Doc. 71 at 15:24; *id.* at 21:20–23.
[288] *Id.* at 16:5–19; *id.* at 17:1–2, 16–19.
[289] R. Doc. 67-6 at 7.
[290] *Id.* at 5–6.
[291] *Id.* at 7–8.
[292] *Id.* at 6–7.
[293] *Id.* at 6.

document" that shared more information about the appropriate testing accommodations for O.E. because Willow's policy requires that an applicant's IEP must be current and dated within the last three years.[294]

C.E. responded with a lengthy email requesting Schodell's availability for a meeting and reiterating that no matter the accommodations provided that O.E. would never be able to obtain the required minimum score on the Iowa Assessment. He also argued that IEPs "do not expire" and "always remain in effect," despite the fact that "school districts are supposed to update them at least every three years," and offered to provide a letter from O.E.'s doctor(s) and therapist(s) explaining that O.E. cannot pass the Iowa Assessment. C.E. ended the email by explaining that "[i]f Willow is taking a hard line on this (i.e. refusing to even consider providing a waiver of the assessment), then Willow is violating [federal] law . . . ."[295] With no response from Schodell, C.E. emailed again asking whether Willow would meet with C.E. and whether Willow would waive the Iowa Assessment. Schodell eventually confirmed Willow's refusal to waive the Iowa Assessment but reaffirmed "Willow's commitment to providing reasonable accommodations for students with documented disabilities, ensuring they have equal access and opportunity during entrance exams." Schodell also expressed that she was open to exploring accommodations that C.E. believed would best support O.E. and welcomed any relevant documentation to that effect, as "it is not standard practice during the admissions process to meet individually with families."[296] The email exchange ended with C.E. stating that he would provide the relevant documentation but "guarantee[ing]"

---

[294] *Id.* at 5–6.
[295] *Id.* at 5.
[296] *Id.* at 3–4.

that Willow will "face a lawsuit" "if Willow is unwilling to waive the assessment."[297] At some point, C.E. emailed Willow eight medical documents regarding O.E.[298]

O.E. ended up taking the Iowa Assessment over a span of two days in February 2025 at Willow's middle school campus.[299] Willow provided various accommodations to O.E.'s taking the assessment including a human reader to read the entire assessment aloud, alternative response format, answers recorded, breaks as needed, extended and flexible testing time over the course of multiple days, wheelchair-accessible testing environment with appropriate seating and physical accommodations, a quiet room with minimal distractions, and comfort objects.[300] O.E. was permitted to use his AAC device to communicate throughout the assessment days, but he did not use the device as an accommodation because it was not used for the assessment responses.[301]

O.E. scored in the eighth and second percentiles on the Iowa Assessment.[302] Because he did not obtain the requisite minimum score on the Iowa Assessment, he was not eligible to attend Willow for the 2025-2026 school year. Instead, O.E. is currently attending NOLA-PS's one direct-run school and is "thriving" there; though, his mother expressed that "there's been a lot of speculation about whether the school will be in existence after this year," which puts O.E.'s family in "limbo" regarding O.E.'s future schooling.[303]

---

[297] *Id.* at 2–3.
[298] *Id.* at 12.
[299] R. Doc. 71 at 201:4–6.
[300] R. Doc. 67-9; R. Doc. 71 at 201:18–23.
[301] R. Doc. 67-9 at 1.
[302] R. Doc. 71 at 138:12–17.
[303] *Id.* at 22:1–17.

### C.  Law and Analysis

#### i.  Likelihood of Success on the Merits

"To satisfy the first element of likelihood of success on the merits, the [plaintiff's] evidence in the preliminary injunction proceeding 'is not required to prove [his] entitlement to summary judgment."[304] In other words, a "plaintiff must present a prima facie case but need not show a certainty of winning."[305] But "[n]o matter how severe and irreparable an injury one seeking a preliminary injunction may suffer in its absence, the injunction should never issue if there is no chance that the movant can show some likelihood of ultimate success."[306] Thus, "'the absence of likelihood of success on the merits is sufficient to make a district court's grant of a preliminary injunction improvident as a matter of law[.]'"[307] To assess the likelihood of success on the merits, the court looks to standards provided by the substantive law.

#### a.  ADA Claim

Applying the ADA's three-prong prima facie test articulated above, O.E.'s ADA claim is likely to fail for a multitude of reasons. First and foremost, for the reasons stated above, O.E. has failed to state a claim for relief under Title II of the ADA. Second, even assuming O.E. has plausibly alleged a Title II ADA claim, O.E. still fails the likelihood-of-success element. O.E. primarily relies on his disparate-impact claim to enjoin Willow from using the Iowa Assessment. For the reasons previously articulated, this Court declines to find that a disparate-impact claim is cognizable under Title II of the ADA. But even if this Court were to find a disparate-impact claim cognizable, O.E.'s statistical evidence does not demonstrate a causal relationship between

---

[304] *Janvey v. Alguire*, 647 F.3d 585, 595 (5th Cir. 2011) (quoting *Byrum v. Landreth*, 566 F.3d 442, 446 (5th Cir. 2009)).
[305] § 2948.3 Grounds for Granting or Denying a Preliminary Injunction—Likelihood of Success on the Merits, 11A Fed. Prac. & Proc. Civ. § 2948.3 (3d ed.).
[306] *State of Tex. v. Seatrain Int'l, S. A.*, 518 F.2d 175, 180 (5th Cir. 1975).
[307] *Lake Charles Diesel, Inc. v. Gen. Motors Corp.*, 328 F.3d 192, 203 (5th Cir. 2003).

Willow's use of the Iowa Assessment and Willow's low enrollment of students with intellectual disabilities. To prove a disparate-impact claim, a plaintiff must show that the challenged policy causes the disparity at issue.[308] Statistics introduced at the hearing undermine that contention. While Willow enrolls fewer than five percent of students with intellectual disabilities, two other NOLA-PS charter schools that do not use additional admissions criteria report nearly the same percentages. This similarity weakens any argument that the Iowa Assessment is responsible for the disparity.[309]

Third, O.E. introduced no evidence upholding the conscious-discrimination theory. The evidence introduced established that the Iowa Assessment is not an IQ test, and the fact that Willow has students with borderline intellectual functioning only underscores this fact. Additionally, the evidence introduced shows that Willow has legitimate, non-discriminatory reasons for using the Iowa Assessment; unlike GPA, which is a subjective measure of an applicant's academic performance, the Iowa Assessment provides the school with an objective measure of whether an applicant is ready for Willow's rigorous academic environment. And this measure appears to be a valid measure because Willow currently has students in the borderline intellectual functioning range who are performing well on school assessments.

Finally, as noted above, "a public entity is not 'required to undertake measures that would impose an undue financial or administrative burden, . . . or effect a fundamental alteration in the nature of the service.'"[310] At the hearing, Willow introduced evidence establishing that enjoining

---

[308] See Texas Dep't of Hous. & Cmty. Affs. v. Inclusive Communities Project, Inc., 576 U.S. 519, 542 (2015) ("[A] disparate-impact claim that relies on a statistical disparity must fail if the plaintiff cannot point to a defendant's policy or policies causing that disparity.").

[309] See id.; Pouncy v. Prudential Ins. Co. of Am., 668 F.2d 795, 801–02 (5th Cir. 1982) (finding that evidence presented at trial could not establish a case of employment discrimination based on the disparate impact model where statistics presented showed that, on the whole, blacks were overrepresented in the lower levels of defendant–company's workforce but that the overrepresentation might have resulted from any number of causes).

[310] Frame v. City of Arlington, 657 F.3d 215, 232 (5th Cir. 2011).

use of the Iowa Assessment in its admissions practices would likely fundamentally alter the nature of its program. Willow made clear that the school's mission and purpose is to serve students who "require a challenge" by providing them with "high academics" curriculum and instruction. Not only does an academic achievement test provide an objective predictor of performance in Willow's program, but Willow already takes several other measures into consideration, such as GPA and parental input. Therefore, it is hard to imagine what other criterion Willow could substitute in place of an assessment, and O.E. proposed no other measures that could replace an assessment's objective, consistent function in Willow's application process.

Additionally, the evidence introduced suggests that Willow and the other groups of schools that have additional admissions criteria play an important role in NOLA-PS's hybrid district, a district that has improved and experienced success since Hurricane Katrina. For those reasons, O.E. has failed to show a likelihood of success on the merits of his ADA claim.

### b.  IDEA Claim

For the reasons explained above, the law does not provide relief to O.E. under the IDEA because he was not enrolled in Willow. Therefore, it is unlikely that O.E. will succeed on the merits of his IDEA claim.

### ii.  Other Factors

"If the party requesting a preliminary injunction *cannot* show a substantial likelihood of success on the merits, the injunction should be denied and there is no need for the court to address the other requirements for a preliminary injunction."[311] Because O.E.'s ADA and IDEA claims

---

[311] *Butts v. Aultman*, 953 F.3d 353, 361 (5th Cir. 2020) (citing *Lake Charles Diesel, Inc. v. Gen. Motors Corp.*, 328 F.3d 192, 203 (5th Cir. 2003) (affirming district court's dismissal of claims when plaintiffs lacked standing and claims were not supported by law and then affirming district court's denial of plaintiffs' motion for temporary restraining order and preliminary injunction based on grounds for dismissals under likelihood-of-success-on-the-merits prong,

fail on the merits, he has not demonstrated a substantial likelihood of success. Therefore, he is not entitled to preliminary relief.

## IV.      CONCLUSION

Accordingly,

**IT IS ORDERED** that Defendant's motion to dismiss Plaintiffs' claim under the Individuals with Disabilities Education Act (R. Doc. 30) is **GRANTED** and that Plaintiffs' IDEA claim is **DISMISSED WITH PREJUDICE**.

**IT IS FURTHER ORDERED** that Defendant's motion to dismiss for lack of standing, pursuant to Federal Rule of Civil Procedure Rule 12(b)(1), (R. Doc. 30) is **DENIED AS MOOT**.

**IT IS FURTHER ORDERED** that Defendant's motion to dismiss Plaintiffs' claims under Title II of the Americans with Disabilities Act (R. Doc. 30) is **GRANTED** and that Plaintiffs' ADA claim is **DISMISSED WITHOUT PREJUDICE**. Plaintiffs have **twenty-one (21) days** to file an amended complaint if they believe that they can allege, **in good faith**, sufficient facts to state a plausible claim under Title II of the ADA.

**IT IS FURTHER ORDERED** that Plaintiffs' state law claims are **DISMISSED WITHOUT PREJUDICE**. Pursuant to 28 U.S.C. § 1367(d), Plaintiffs shall have the applicable time period under Louisiana law to file their remaining claims in state court, if they so choose, or **twenty-one (21) days** to refile the claims in this Court as part of the Amended Complaint.

**IT IS FURTHER ORDERED** that Defendant's motion to dismiss Plaintiffs' claims under the Louisiana Human Rights Act for failure to state a claim, pursuant to Federal Rule of Civil Procedure 12(b)(6), (R. Doc. 30) is **DENIED AS MOOT**.

---

stating that there is no need for court to address other requirements for preliminary injunction when merits prong not met).

54

**IT IS FURTHER ORDERED** that Defendant's motion to dismiss for failure to join a party under Federal Rule of Civil Procedure 19, pursuant to Federal Rule of Civil Procedure 12(b)(7), (R. Doc. 30) is **DENIED AS MOOT**.

**IT IS FURTHER ORDERED** that Plaintiffs' motion for preliminary injunction (R. Doc. 16) is **DENIED**.

In light of the foregoing, **IT IS FURTHER ORDERED** that Plaintiffs' motion to renew his partial summary judgment (R. Doc. 32) is **DENIED AS MOOT**.

New Orleans, Louisiana, this 17th day of March 2026.

**DARREL JAMES PAPILLION**
**UNITED STATES DISTRICT JUDGE**